114 P.3d 1215 (2005)
In re the DEPENDENCY of I.J.S., a Minor Child,
State of Washington, Department of Social and Health Services, Division of Child and Family Services, Respondent,
v.
Sylvia Vega, Appellant,
State of Washington, Department of Social and Health Services, Division of Child and Family Services, Respondent,
v.
Joshua Smith, Appellant.
Nos. 53716-4, 53717-2-I.
Court of Appeals of Washington, Division 1.
June 13, 2005.
Reconsideration Denied June 28, 2005.
*1216 Jennifer L. Dobson, Christopher Gibson, Nielsen Broman & Koch PLLC, Seattle, for Sylvia Vega.
Sarah McNeel Hrobsky, Oliver Ross Davis, Washington Appellate Project, Seattle, for Joshua Smith.
Terri Winters Malolepsy, Office of the Attorney General, Seattle, for Respondent.
Lori Larcom Irwin, King County Superior Court/Dependency CASA, Seattle, for Court Appointed Special Advocate (CASA).

OPINION PUBLISHED IN PART
SCHINDLER, J.
¶ 1 Sylvia Vega and Joshua Smith appeal the trial court orders terminating their parental rights to their son I.J.S. Relying on In re Custody of Smith,[1] the parents contend Washington's termination statutes, RCW 13.34.180 and 13.34.190, are unconstitutional and violate substantive due process because (1) the State is not required to prove the relationship with the parent harms the child and (2) the State must prove dependency guardianship is not a viable alternative to termination regardless of whether a dependency guardianship petition has been filed. If the statutes are constitutional, Vega and Smith each argue the State did not meet its burden of proving three of the six statutory factors under RCW 13.34.180 by clear, cogent and convincing evidence.[2] It is well-established *1217 that the State has a compelling interest to protect children from harm. We conclude Washington's termination statutes require the State to prove the relationship with the parents harms the child but proof of the statutory factors satisfies that burden. In the absence of a petition for dependency guardianship, the State is not required to prove that guardianship is not an alternative to termination. We also conclude substantial evidence supports the trial court's decision that all reasonably available services capable of correcting parental deficiencies were offered, there is little likelihood conditions will be remedied in the near future, continuation of the parent-child relationship would diminish I.J.S.'s prospects for early integration into a stable and permanent home, and termination is in I.J.S.'s best interests. We affirm the trial court orders terminating the parental rights of Vega and Smith to I.J.S.

FACTS
¶ 2 I.J.S. was born on January 16, 2002. Sylvia Vega is his mother and Joshua Smith is his father. Before I.J.S. was born Vega and Smith lived together at numerous locations and had an unstable lifestyle. When Vega first met Smith he was in a methadone program, but throughout their approximately four-year relationship Vega and Smith used heroin on a daily basis. They also used other drugs, including cocaine, ecstasy, acid, marijuana and prescription medications. Throughout their relationship, Vega depended on Smith for emotional and financial support.
¶ 3 Two days before I.J.S. was born, Smith was arrested for three counts of bank robbery and embezzlement. Smith subsequently pleaded guilty to two counts of second degree robbery, and one count of possession of marijuana with intent to manufacture or deliver and was sentenced to twenty-seven months in prison.
¶ 4 On March 2, 2002 Vega called a crisis help line. Vega said I.J.S.'s father was in prison and she was being evicted. Vega was afraid she would harm herself and wanted someone to come get I.J.S. to take care of him. At the request of Child Protective Services (CPS), police officers went to Vega's apartment to take I.J.S. into protective custody. According to the officers, "the mother's home was dirty, there was moldy food in the home and narcotic parephenalia(sic) in the bedroom and the bathroom."[3]
¶ 5 On March 5, Vega signed a three month voluntary placement agreement for I.J.S. and a services contract. In the services contract, Vega agreed to obtain mental health counseling at the Community Psychiatric Clinic (CPC), submit to urinalysis (UA), and visit I.J.S. for a minimum of one hour a week. In March and April, Vega visited I.J.S. three times.
¶ 6 On March 15, 2002 Vega went to CPC for an evaluation. Vega was diagnosed by CPC with major depressive disorder and strong suicide ideation. CPC prescribed an antidepressant, Effexor. Although the Effexor helped her, Vega started using drugs again.
¶ 7 On June 5 Vega signed another three-month voluntary placement agreement for I.J.S. and a services contract with the same requirements (to obtain mental health counseling, submit to urinalyses (UA's), and visitation with I.J.S.). On June 7 and 10 Vega tested positive for heroin, cocaine, codeine, and morphine. Vega told the CPS caseworker she was using heroin daily and was also using cocaine and prescription drugs. Vega also told the caseworker she used heroin and ecstasy with Smith prior to her pregnancy and was using heroin, cocaine, marijuana, pills and alcohol within one month of I.J.S.'s birth.
¶ 8 On June 17 Vega attended her first session at CPC. The next week she participated in a second session at CPC, but cancelled the next one. Approximately a year later, CPC discharged Vega for not participating in counseling sessions.
¶ 9 On July 2, the State filed a petition for the dependency of I.J.S. The dependency dispositional order for Vega required her to obtain a drug and alcohol evaluation and participate in treatment recommendations, submit to random UA's, obtain mental health *1218 services and attend parenting classes. The order also provided for supervised visitation with I.J.S. The dispositional order for Smith required him to establish paternity after release from prison, provide the case worker with a release for all services and evaluations received while incarcerated, and contact the case worker every six months. The order stated that visitation and other services would be assessed after Smith established paternity and was released from prison. In the order, Smith expressly reserved the right to set a hearing to address visitation when he was in minimum custody or work release.
¶ 10 On August 5 TASC evaluated Vega and diagnosed her as heroin, alcohol and cocaine dependent. Vega entered detox in early September, but left after two days and continued using drugs.
¶ 11 In early September 2002, Vega and Smith each agreed to entry of orders of dependency. In late September, Vega entered detox again but was discharged in November for failure to participate in the program.
¶ 12 In December 2002 Vega successfully completed detox and on December 23 she moved into Genesis House, a long-term inpatient residential treatment facility.
¶ 13 The Genesis House program requires nine months of inpatient treatment followed by outpatient treatment. According to Genesis House staff, Vega needed clinically managed, high intensity care. While at Genesis House, Vega attended parenting classes and had consistent visitation with I.J.S. for two hours a week. Visitation was later increased to four hours a week.
¶ 14 Vega's participation in the Genesis House program was inconsistent. She completed phase one and two in early September 2003, but was terminated before completing the program. Genesis House terminated Vega for unsatisfactory participation and not complying with the rules and requirements of the program. The Genesis House discharge report described Vega's behavioral changes as superficial and her prognosis for long-term recovery as poor.
¶ 15 On April 3, 2003 the State filed a petition to terminate the parental rights of Vega and Smith. The petition described the parents' drug history and the circumstances related to I.J.S.'s dependency. Vega was only in the beginning stages of drug treatment and had not obtained mental health services and Smith was in prison and had not established paternity. The State alleged there was little likelihood either parent could remedy their parental deficiencies in the child's near future.
¶ 16 After Smith's release in August 2003, he was assessed for services and told to establish paternity, obtain a drug and alcohol evaluation and participate in recommended treatment, submit to random UA's and attend parenting classes. Smith temporarily moved in with his ex-wife and their nine-year-old daughter and obtained a job washing windows in high-rise buildings. Smith established paternity of I.J.S. after the court entered an order requiring him to do so on September 30. Smith also enrolled in parenting classes. Smith said he obtained a drug and alcohol evaluation, but did not provide a copy to the State. Smith's first UA was positive for alcohol but the subsequent 15 or 16 UA's were negative.
¶ 17 Against the advice of the Genesis House counselors, Vega resumed her relationship with Smith and relied on him for emotional and financial support.
¶ 18 When Vega was terminated from Genesis House, the State facilitated her move to Oxford House, a clean and sober housing facility. In October 2003 Vega began outpatient drug and alcohol treatment at Therapeutic Health Services. Vega also attended some Alcoholics Anonymous meetings and enrolled in parenting classes. Oxford House referred Vega to a number of facilities for mental health counseling. At the time of trial, Vega did not have a sponsor for outpatient treatment and had not begun mental health counseling.
¶ 19 The six-day termination trial began at the end of October 2003. At the conclusion of the trial, the court terminated Vega's and Smith's parental rights to I.J.S. On January 10, 2003 the court entered findings of fact, conclusions of law and orders of termination as to Vega and Smith. Vega and Smith *1219 appeal the trial court orders terminating their parental rights to I.J.S.

Constitutional Challenge To Termination Statutes
¶ 20 The parents contend Washington's termination statutes, RCW 13.34.180 and .190, are unconstitutional and violate substantive due process because the State is not required to prove that the relationship with the parents harms the child or that a dependency guardianship is not a viable alternative. The parents' contentions are not supported by the statutory scheme or the law.
¶ 21 A statute is presumed constitutional.[4] A party challenging a statute has the burden of proving it is unconstitutional beyond a reasonable doubt.[5] Courts must begin "with the assumption that the legislature, which is a coequal branch of government that is sworn to uphold the Constitution, has indeed considered the constitutionality of its enactments."[6] Because the parents assert a facial challenge, they must also prove "no set of circumstances exists in which the statute, as currently written, can be constitutionally applied."[7]
¶ 22 The Washington and United States Constitutions guarantee that no person may be deprived of life, liberty, or property without due process of law.[8] It is well established that parents have a fundamental liberty and privacy interest in the care and custody of their children.[9] But a parent's constitutional due process rights are not absolute. A statute that allows the State to interfere with a fundamental right is constitutional "only if the State can show that it has a compelling interest and such interference is narrowly drawn to meet the compelling state interest involved."[10] In a termination proceeding, the State has a compelling interest to prevent harm to children and has an obligation to intervene and protect a child from harm or the risk of harm.[11] "[W]hen parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child."[12]
¶ 23 The parents rely on In re Smith to argue that the termination statutes are unconstitutional because the statutes do not require a threshold showing of harm and the statutes impermissibly use a best interest of the child standard. In In re Smith the Washington Supreme Court held that the third party visitation statutes did not establish a compelling state interest and unconstitutionally interfered with parental rights. The Court concluded the statutes did not require the State to show harm and the trial court could grant visitation rights to third parties whenever "visitation may serve the best interest of the child ....'"[13] "[r]egardless of the fact that the parent's fitness is not challenged or that there has been no showing of harm or threatened harm to the child."[14] In deciding the statute was unconstitutional, the Court contrasted the third party visitation statutes with the State's obligation to interfere with parents' rights to protect children from harm.[15] Unlike the third party visitation statutes, the legislature in the termination *1220 statutes requires the State to intervene and protect a child from harm. And, although the termination statutes focus on a best interest of the child standard, the State must also prove six statutory factors and that the relationship with the parents actually or potentially harms the child.
¶ 24 In order to terminate the parent-child relationship, the State must prove the six statutory factors set forth in RCW 13.34.180(1) by clear, cogent and convincing evidence.
¶ 25 The statutory elements of RCW 13.34.180(1) are that:
(a) the child has been found to be a dependent child;
(b) the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
(e) there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future [and]
(f) continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.
Only after the State proves the six statutory factor, does the court consider whether, by a preponderance of the evidence, termination is in the best interests of the child. RCW 13.34.190(1)(a).
¶ 26 Here, there is no dispute that I.J.S. was a dependent child under RCW 13.34.180(1)(a). A dependent child is defined as a child who:
(a) has been abandoned;
(b) Is abused or neglected ... by a person legally responsible for the care of the child; or
(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.[16]
Establishing the child is dependent under RCW 13.34.180(1)(a) and it is unlikely conditions can be remedied so the child can be returned in the near future under RCW 13.34.180(e) is equivalent to finding harm to the child. We conclude that unlike the third party visitation statutes in In re Smith, the termination statutes are narrowly drawn because the State must prove that the relationship with the parents harms or potentially harms the child before the court can terminate parental rights.
¶ 27 The parents also argue the termination statutes are unconstitutional because the State is not required to prove that a dependency guardianship is a viable alternative to termination. When a dependency guardianship petition is filed, the trial court must consider whether guardianship rather than termination is in the child's best interests.[17] The parents argue strict scrutiny requires consideration of a dependency guardianship in every termination regardless of whether a petition has been filed.
¶ 28 In 1994, the legislature amended the dependency guardianship statute to ensure that "[d]ependency guardianships now offer sufficient permanency to present a viable alternative to termination in appropriate cases."[18] In K.S.C., the Washington Supreme Court reviewed the amended guardianship and termination statutes and held that "[t]he 1994 legislative amendments to RCW 13.34.231 do not require a court to consider a dependency guardianship, whether as an alternative to termination or otherwise, where the State has petitioned for termination *1221 and no party has petitioned for a dependency guardianship."[19]
¶ 29 Relying on this court's recent opinion in In re Dependency of A.C.,[20] the parents argue that because dependency guardianship is a viable alternative to termination, strict scrutiny requires the trial court to consider dependency guardianship in every case regardless of whether a petition is filed. The parents' reliance on In re A.C. is misplaced. Our decision in A.C. is consistent with the Court's decision in K.S.C. and is distinguishable from this case.
¶ 30 The trial court in A.C. was "faced with competing petitions for guardianship and termination."[21] The mother had filed a dependency guardianship petition naming her sister and brother-in-law as guardians and the State had filed a petition to terminate the mother's parental rights. In A.C., we adopted the "factors for consideration where both options are presented"[22] and decided the dependency guardianship is mandatory if the first five factors in the statute are satisfied and the court finds that "guardianship, rather than termination of the parent-child relationship or continuation of efforts to return the child to the custody of the parent, would be in the best interest of the child."[23]
¶ 31 If both a dependency guardianship and a termination petition are filed, the trial court must first consider the dependency guardianship as an alternative to termination. But here, the parents admit no party has petitioned for a dependency guardianship for I.J.S. As in K.S.C., "[t]here is no evidence of any petition to create a dependency guardianship, no evidence of any order creating such a guardianship, and no indication that any hearing relating to one has ever been held."[24] "[W]hen faced solely with a petition for termination of parental rights, the court's inquiry is whether the allegations in RCW 13.34.180 are proved by clear, cogent and convincing evidence, and whether termination is in the best interest of the child."[25]
¶ 32 In addition, the record does not support the parents' argument that a dependency guardianship for I.J.S. was a viable alternative. I.J.S.'s paternal grandfather was the only person mentioned as a potential guardian. Early on, the State asked the grandfather whether he was willing to consider a dependency guardianship. At first, he said he was willing to do so, but the next day he called and told the caseworker he did not want to assume this responsibility because he was already caring for three other grandchildren with special needs. At trial, the grandfather testified he would be willing to allow Smith or Vega to live in his home and he would supervise their care of I.J.S., but that he did not want to be primarily responsible for I.J.S.
¶ 33 The parents have not met their burden of proving Washington's termination statutes are unconstitutional. The State has a compelling interest to prevent harm to children and the dependency and termination statutes allow the State to intervene to protect a child from harm. To terminate the parent-child relationship the State must meet its burden of proving the statutory factors. A court must consider a dependency guardianship as an alternative to termination only when a petition for a dependency guardianship has been filed. In A.C. we did not hold that a dependency guardianship should be considered in the absence of dependency guardianship petition. We conclude Washington's termination statutes, RCW 13.34.180 and RCW 13. 34.190, do not violate the parent's substantive due process rights. We also conclude strict scrutiny does not require the *1222 trial court to consider dependency guardianship as an alternative if a petition has not been filed.[26]
¶ 34 The balance of this opinion has no precedential value. Accordingly, pursuant to RCW 2.06.040 it will not be published.
APPELWICK and COX, JJ., concur.
NOTES
[1] 137 Wash.2d 1, 969 P.2d 21 (1998), aff'd sub nom Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).
[2] Vega and Smith each filed a separate appeal and the cases were consolidated. Smith adopted that part of Vega's supplemental brief addressing the constitutional challenge to the termination statutes. Smith and Vega each makes a different argument regarding why the trial court's findings are not supported by substantial evidence.
[3] Clerk's Papers (CP) at 97.
[4] State v. Coria, 120 Wash.2d 156, 163, 839 P.2d 890 (1992); Haley v. Medical Disciplinary Bd., 117 Wash.2d 720, 739, 818 P.2d 1062 (1991).
[5] In re Osborne, 119 Wash.App. 133, 147, 79 P.3d 465 (2003).
[6] Osborne, 119 Wash.App. at 147, 79 P.3d 465, citing Island County v. State, 135 Wash.2d 141, 147, 955 P.2d 377 (1997).
[7] City of Redmond v. Moore, 151 Wash.2d 664, 669, 91 P.3d 875 (2004).
[8] U.S. Const. amends. V, XIV; art.1, section 3, Wash. Const.
[9] Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re Smith, 137 Wash.2d 1, 27, 969 P.2d 21 (1998).
[10] Smith, 137 Wash.2d at 15, 969 P.2d 21.
[11] Santosky, 455 U.S. at 766, 102 S.Ct. 1388.
[12] In re Sumey, 94 Wash.2d 757, 762, 621 P.2d 108 (1980).
[13] In re Smith, 137 Wash.2d at 7, 969 P.2d 21, quoting RCW 26.10.160(3).
[14] In re Smith, 137 Wash.2d at 17, 969 P.2d 21.
[15] Sumey, 94 Wash.2d at 762, 621 P.2d 108.
[16] RCW 13.34.030(5).
[17] RCW 13.34.231(6).
[18] In re A.C., 123 Wash.App. 244, 251, 98 P.3d 89 (2004).
[19] K.S.C., 137 Wash.2d at 931, 976 P.2d 113.
[20] A.C., 123 Wash.App. 244, 98 P.3d 89.
[21] A.C., 123 Wash.App. at 246, 98 P.3d 89.
[22] A.C., 123 Wash.App. at 252, 98 P.3d 89 (emphasis added).
[23] A.C., 123 Wash.App. at 251, 98 P.3d 89 (emphasis added).
[24] K.S.C., 137 Wash.2d at 928, 976 P.2d 113.
[25] K.S.C., 137 Wash.2d at 930, 976 P.2d 113. In the absence of a petition for dependency guardianship, if the court finds the allegations in RCW 13.34.180 and .190 are not met, the alternative is to continue the child's dependency and foster placement.
[26] We would reach the same result under an as-applied constitutional challenge because the State met its burden of proving the relationship with Vega and Smith harmed I.J.S. and substantial evidence supports the trial court's findings.