# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Welfare of | No.  47783-1-II |
| C.H-K., | |
| Minor Child, | |
| T.K. and I.H., | |
| Appellants, | UNPUBLISHED OPINION |
| v. | |
| DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent. | |

JOHANSON, J.  —  IH and TK, both of whom have cognitive disorders that affect their ability to parent, appeal the juvenile court's order terminating their parental rights to CH-K.[1]  They argue that the juvenile court erred in finding that clear, cogent, and convincing evidence supported its termination order.  IH also argues that the juvenile court violated her due process rights.  We disagree and hold that substantial evidence supports the juvenile court's findings and that IH's due process rights were not violated.  Accordingly, we affirm.

---

[1] To provide some confidentiality, we use the minors' and their family members' initials in the case caption and in the body of the opinion.

FACTS

I. Background[2]

IH and TK have five children. Between 2009 and 2012, the parents' three older children were declared dependent on the State and the parents participated in court-ordered services. The parents' rights to these children were terminated in 2013.

In July 2012, CH-K was born. In October 2012, CH-K was declared dependent. In November 2013, CH-K's younger brother, AH-K, was born and since February 2014, AH-K was placed in in-home dependency. During CH-K's and AH-K's dependencies, the parents were provided with a Safe Care referral, mental health counseling, multiple rounds of counseling from Family Preservation Services, and Home Builders'[3] 30-day intensive in-home coaching. TK and IH were each provided a parent mentor.

Safe Care is a hands-on parenting education coaching program offered in the home setting and is designed to increase understanding of safety hazards, health and safety issues, and how to foster positive parent-child interactions. Typically, Safe Care is offered once a week for 40 minutes to an hour for 18 to 22 weeks. The juvenile court found that the failure to use a video component did not invalidate the Safe Care's service. Safe Care uses a variety of instructional approaches and the juvenile court concluded it was just the sort of adapted service appropriate for TK and IH.

---

[2] We rely primarily on the juvenile court's findings of fact following the bench trial.

[3] Home Builders is an intensive, in-home service addressing the same issues as Safe Care but is offered for 10 hours per week or more for one month or more.

The parents received many services that were adequately adapted to address their learning disabilities. Although many providers appropriately tailored services and provided information and tools in a variety of ways and through a variety of modes, the parents were unable to make long-term, sustained improvement. IH and TK received supervised visits for up to 37 hours per week including overnight supervised visits.

## II. PARENTAL DEFICIENCIES

### A. IH

During the dependency, it was established that IH suffers from a cognitive disorder affecting her attention, concentration, sequencing, and executive functioning. She was diagnosed as borderline intellectually disabled, with mixed personality disorder with dependent, avoidant, and schizoid features and with mild paranoia. IH has difficulty learning and remembering new parenting skills and does not understand children's normal or typical developmental stages and needs. IH often lacks empathy and expresses rigid ideas about how children should act. She has weak nurturing skills and lacks flexibility in dealing with children's behaviors. This led to harsh criticism of the children and damaging actions towards them. Service providers observed that IH also did not always accurately perceive what occurred, which affected her parenting.

For example, IH persisted in using a shower spray nozzle to quickly bathe CH-K even though it caused CH-K anxiety. She also blamed CH-K and spoke harshly to CH-K for normal behavior like spilling drinks or wetting her pants.

### B. TK

During the dependency it was also established that TK has cognitive disorders that impair his ability for executive decision making, his ability to prioritize, and his ability to understand

consequences. TK has a paranoid personality, shows limited ability to process basic information, and has a lack of knowledge of general principles of child rearing and basic developmental concepts. TK's disorders and cognitive limits negatively impacted his parenting. He was rigid in his approach to CH-K and to IH. He did not communicate effectively with IH or with service providers. TK was compromised in his ability to manage stress, anger, and to deal with anxiety. TK also lacked personal insight in regard to his and IH's limitations that place CH-K's safety and healthy development at risk.

### C. HOME CONDITIONS AND PARENTING ARRANGEMENT

Service providers found the home environment posed a risk to CH-K. The cluttered home created tripping hazards, fall hazards, and restricted the normal movement of CH-K within and outside the home. TK and IH had numerous cats in the home—more than five at a time—that created an unsanitary environment for the children. The Department of Social and Health Services (DSHS) worked with TK and IH to address the risks posed by the home environment and offered services to address the issues. Although at times the home environment improved, the conditions recurred. TK and IH failed to recognize that the home conditions interfered with child development and posed a significant safety risk.

This safety risk heightened when IH had to care for more than one child, as she was not capable of the focus necessary to keep multiple children safe in the home environment. In 2014 and 2015, TK began spending more time at home with IH and AH-K and with CH-K during her visits. TK was higher functioning than IH and his presence mitigated some of her deficiencies, but TK failed to acknowledge IH's deficiencies. TK and IH did not communicate well with each

other, which negatively impacted their parenting. If CH-K and AH-K had been returned to their care, TK's plan was to work outside the home with IH as the primary caretaker.

### III. TERMINATION FACT FINDING

On March 15, 2013, DSHS filed a petition to terminate IH and TK's parental rights to CH-K. The termination trial was continued five times between 2013 and 2015. In March 2015, the fact-finding hearing was held. CH-K was three years old at the time of trial. Several service providers who worked with TK and IH between 2010 and 2015 testified. Seven of those service providers testified that TK and IH were not capable of remedying their parental deficits and could not adequately provide care for CH-K in the foreseeable future.

On June 25, 2015, the juvenile court ordered termination of TK and IH's parental rights to CH-K. Based on its findings, the juvenile court concluded that the elements of RCW 13.34.180(1)(a) through (f) had been established by clear, cogent, and convincing evidence. The juvenile court also concluded that the State established that the mother and father were currently unfit and unable to parent and that termination of the mother and father's parental rights was in CH-K's best interest.

### ANALYSIS

#### I. SUBSTANTIAL EVIDENCE SUPPORTS THE FINDINGS

##### A. STANDARD OF REVIEW AND RULES OF LAW

The juvenile court may order termination of a parent's rights if DSHS establishes the six elements in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925,

976 P.2d 113 (1999). In addition to the statutory elements of RCW 13.34.180(1), due process protections require that a court make a finding of unfitness before parental rights can be terminated. *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995). This finding does not need to be made explicitly because satisfying all of the statutory elements raises an implied finding of parental unfitness. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011). DSHS also must prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b).

We uphold the juvenile court's factual findings if those findings are supported by substantial evidence. *In re Parental Rights to M.J.*, 187 Wn. App. 399, 406, 348 P.3d 1265 (2015). Where a party is required to establish its case by "'clear, cogent, and convincing evidence,'" we incorporate that standard of proof into our review. *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990) (quoting RCW 13.34.190). Thus, the question to be resolved is not merely whether there is substantial evidence to support findings but whether there is substantial evidence in light of the "highly probable" test. *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). Because the juvenile court has the advantage of observing the witnesses, deference to the juvenile court is particularly important in termination proceedings. *K.S.C.*, 137 Wn.2d at 925. We do not review credibility determinations or weigh the evidence. *In re Welfare of A.G.*, 155 Wn. App. 578, 588, 229 P.3d 935, *remanded*, 169 Wn.2d 1032 (2010).

## B.  SUBSTANTIAL EVIDENCE THAT ALL NECESSARY SERVICES PROVIDED

1.     DSHS TAILORED SERVICES TO MEET PARENTS' NEEDS

Both TK and IH argue that the juvenile court's finding that all necessary services were appropriately tailored is unsupported by substantial evidence.[4]  We disagree.

Under RCW 13.34.180(1)(d), DSHS must prove "[t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided."  "Necessary services" are those services "needed to address a condition that precludes reunification of the parent and child."  *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014).

The Americans with Disabilities Act (ADA) requires public entities to make reasonable accommodation for disabled persons, but does not require public entities to provide the disabled with services not offered to others.  42 U.S.C. § 12132; *In re Welfare of H.S.*, 94 Wn. App. 511, 521, 973 P.2d 474 (1999).  A termination should be upheld and the ADA is not violated where all reasonably available services are provided to the parents, the services were modified by the individual providers to accommodate parents' special needs, and the juvenile court's finding that the best interests of the child were met by termination of parental rights is amply supported by clear, cogent, and convincing evidence.  *In re Welfare of A.J.R.*, 78 Wn. App. 222, 230, 896 P.2d 1298 (1995); *see also H.S.*, 94 Wn. App. at 521.

---

[4] The parties do not dispute that the first three elements of RCW 13.34.180(1) were met:  (a) CH-K was found dependent, (b) the juvenile court entered a dispositional order, and (c) CH-K had been removed for over six months.  RCW 13.34.180(a)-(c).

7

The juvenile court found that while some providers throughout the years failed to provide ideally adapted services, many service providers appropriately tailored their services for TK and IH. Brenda Sullens, a parent coach, met with both TK and IH from March 2011 to July 2012 while they were trying to parent their three older children. Sullens identified the specific needs of the family and tailored her approach based on TK's and IH's learning style. Stephen Harding, TK's therapist from January 2012 to June 2012, testified that he had experience working with parents with cognitive impairments and that the therapy he provided was appropriate for TK. Laura Gustavson, IH's therapist from May 2011 to January 2012, testified that she was aware of IH's cognitive deficits and accommodated her treatment accordingly. Parenting Protection Group instructor Christa Sommerfeld worked with both TK and IH from September 2012 to May 2013. Sommerfeld testified that she allowed them to progress through the program, despite their inability to complete assignments to the program's specifications, as an accommodation for their disabilities.

From December 2013 until 2015, Denise Johnson, a Child Protective Services (CPS) investigation unit supervisor, oversaw TK and IH's case. Johnson has a degree in education and training in working with and designing service plans for parents with developmental delays. Johnson spoke to all of TK's and IH's service providers when she was on the case and evaluated their methods. She instructed the service providers to offer their instructions in multiple forms, including in writing, so TK and IH could review the information more than once and seek advice about it. Johnson also reviewed a report containing recommendations to DSHS about working with adults with developmental disabilities. From this report, Johnson learned that for a family like TK and IH's, it was important to offer hands-on education using different methods that would

8

allow them to review the material multiple times, to establish trust through openness and transparency, and to consider the economic status and support system available to the family.

Johnson also referred TK and IH to Safe Care for a second time. The Safe Care program is designed to increase understanding of child development, home safety and health, and to foster positive parent/child interaction. Johnson stated that these were key areas of concern for TK and IH and that Safe Care was an appropriate program to meet their needs and increase their skills. When AH-K was returned to the home, Johnson also recommended the Home Builders program, an intensive family preservation service which provides at least 10 hours a week of support. Johnson noted that while typically there are funding challenges associated with offering Home Builders and Safe Care at the same time, she accommodated for TK's and IH's needs and ensured they received both. Johnson also referred them each to a foster parent mentor, and in order to serve TK's and IH's needs, she requested additional mentorship for each of them so the program would extend six months longer than usual.

Megan Kirshbaum, Ph.D in clinical psychology, testified that Tina Santiago, an in-home therapist for Institute for Family Development, worked with the family from September 2012 through May 2013 and appropriately tailored her services to TK's and IH's needs by being respectful and using creative, concrete, and varying approaches. Kirshbaum further testified that Katie Smigaj, who worked with the family from May to July 2013 and from July to December 2014, also adapted her work to TK's and IH's needs. Smigaj did so by praising strengths and combining written and verbal instruction. Kirshbaum also noted that the Safe Care program that the family received includes safety scenarios that are appropriate for parents with intellectual disabilities.

9

Thus, substantial evidence supports the juvenile court's finding that DSHS provided all necessary, reasonably available services and that services were appropriately tailored to TK's and IH's needs. *A.J.R.*, 78 Wn. App. at 230.

2. DSHS WAS NOT REQUIRED TO OFFER ADDITIONAL SERVICES

TK and IH also argue that DSHS should have provided additional services in order to meet the requirements of RCW 13.34.180(1)(d). We disagree.

DSHS does not have to provide services when the parent is unable or unwilling to make use of them. *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988). And even if DSHS "inexcusably fails" to offer services to a willing parent, termination is still appropriate if the services "would not have remedied the parent's deficiencies in the foreseeable future." *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001); *In re Welfare of Hall*, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).[5]

a. VIDEO RECORDED SERVICES

TK argues that he should have been offered video recorded services. The juvenile court found there was a misunderstanding regarding whether, after initially refusing to be videotaped, TK later consented to video use. But the juvenile court found that failure to use the video component in the Safe Care program did not invalidate the service. Safe Care used a variety of instructional approaches and was an adapted service appropriate for TK and IH. TK may have been willing to participate in a video service through Safe Care or another program. But TK has

---

[5] DSHS's responsibility is not fulfilled by a mere offer of services. *See In re Dependency of D.A.*, 124 Wn. App. 644, 653-54, 102 P.3d 847 (2004) (holding that DSHS must follow up if a party who once declined services expresses a willingness to participate later and cannot point to the efforts of others to seek out or offer certain services where DSHS did not).

not shown that the addition of video recorded services would have remedied his parental deficiencies in the near future.

b.     ADDITIONAL EVALUATIONS AND MULTIPLE CHILDREN SERVICES

IH argues that DSHS should have offered her a learning style evaluation or services to help care for two children.[6]  But substantial evidence shows that it would have been futile to offer TK and IH additional services.  DSHS offered IH a parenting evaluation and a neuropsychological evaluation with parenting components.  IH also received individual counseling, cognitive behavioral therapy, and couples' counseling.  Additionally, IH was offered therapy and parent coaching during the dependencies of her three older children addressing how to care for multiple children at once.

Substantial evidence supports the finding that despite being offered evaluations and multiple services, TK and IH were still unable to make long-term, sustained improvements.  The service providers who worked with TK and IH from 2011 to 2013 reported that their progress in developing parenting skills was stagnant, TK and IH failed to acknowledge their parenting deficiencies, and most of the 2013 to 2015 service providers stated that TK and IH could not parent two children at once.

---

[6] IH also argues, "The failure to tailor the mother's services to meet her learning needs violated the ADA."  Br. of Appellant at 15.  However, the ADA is not violated where all reasonably available services are provided to the parents, the services were modified by the individual providers to accommodate parents' special needs, and the juvenile court's finding that the best interests of the child were met by termination of parental rights is amply supported by clear, cogent, and convincing evidence. *A.J.R.*, 78 Wn. App. at 230.  As shown above, substantial evidence shows that services were reasonably tailored to meet the parents' special needs.  And IH does not offer analysis or argument based on the ADA; rather, she argues about whether substantial evidence supports the finding under RCW 13.34.180(1)(d).  For these reasons, her argument fails.

None of the 2013 to 2015 service providers recommended unsupervised visitation; rather, they recommended additional services. In 2015, based on comments from the 2013 to 2015 service providers and her own evaluations of TK and IH, Johnson testified that IH and TK regressed to old ways of thinking or functioning and it would take years before CH-K could be in their care. Multiple providers noted that TK's and IH's progress was stymied by their refusal to acknowledge their parental deficiencies and their belief that DSHS took their children away to profit from the adoptions. TK and IH have failed to show that additional evaluations or additional services would have remedied the parental deficiencies in the near future. *T.R.*, 108 Wn. App. at 164; *Hall*, 99 Wn.2d at 850-51. Thus, substantial evidence supports the juvenile court's finding that all necessary services were expressly and understandably offered.

C. SUBSTANTIAL EVIDENCE OF LITTLE LIKELIHOOD CONDITIONS WILL BE REMEDIED

TK and IH argue that the juvenile court's finding that there was little likelihood that conditions could have been remedied to permit CH-K to return home in the near future is unsupported by substantial evidence.[7] We disagree.

DSHS must show that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. RCW 13.34.180(1)(e). In determining

---

[7] IH argues also that there was evidence showing that she could overcome parenting issues and without provision of properly tailored services, it is impossible to determine if she could have parented CH-K in the near future, while TK argues that there was concrete evidence he progressed with remedying his deficits. These arguments are best characterized as arguments about the weight placed on the evidence. But we do not review credibility determinations or weigh evidence on appeal. *A.G.*, 155 Wn. App. at 588. Thus, we do not review the juvenile court's decision to give greater or lesser weight to certain evidence.

whether RCW 13.34.180(1)(e) has been met, the focus is on whether parenting deficiencies have been corrected. *A.G.*, 155 Wn. App. at 590.

If DSHS offers or provides all necessary services reasonably capable of correcting parenting deficiencies within the foreseeable future and the parent does not substantially improve his or her deficiencies within a year of the dispositional order, a rebuttable presumption arises that DSHS has sufficiently proven there is little likelihood conditions will be remedied in the near future. RCW 13.34.180(1)(e). Once the rebuttable presumption applies, it shifts the burden of production to the parent, but DSHS must still convince the juvenile court that it is highly probable the parent would not improve in the near future. *In re Welfare of C.B.*, 134 Wn. App. 942, 956, 143 P.3d 846 (2006).

Even where evidence shows that a parent may eventually be capable of correcting deficiencies, termination is appropriate if those deficiencies will not be corrected in the near future. *A.G.*, 155 Wn. App. at 590. A determination of what constitutes "near future" depends on the child's age and the circumstances of the placement. *Hall*, 99 Wn.2d at 844, 850-51 (finding eight months not in the foreseeable future for a four-year-old); *see also In re Dependency of A.W.*, 53 Wn. App. 22, 24, 32, 765 P.2d 307 (1988) (one year not in near future of three-year-old). The juvenile court may consider the parent's history of parenting and compliance with services to determine whether conditions are likely to be remedied in the near future. *In re Dependency of J.C.*, 130 Wn.2d 418, 428-29, 924 P.2d 21 (1996).

The juvenile court here found there was little likelihood conditions could be remedied so CH-K could be returned to TK's and IH's care in the near future. Specifically, the juvenile court found that

> [b]oth parents have participated extensively in services for a number of years spanning this child's dependency as well as the dependencies of the parents' older children. Though the parents have, at times, demonstrated the ability to implement new parenting skills, the evidence showed that even after repeating services, progress by both parents has not been sustained. While there is little evidence of imminent risk to the child, the parents are not able to maintain and apply new parenting skills in the long-term.

Clerk's Papers (CP) at 833.

1.    IH's LIKELIHOOD TO REMEDY PARENTAL DEFICIENCIES

Substantial evidence supports the juvenile court's finding that IH was unlikely to remedy her deficiencies to parent CH-K. From 2012 to 2015, IH did not consistently progress in her services to remedy parental deficiencies and service providers who worked with her during various periods from 2011 to 2015 stated that CH-K should not be placed in her sole care.

Johnson and the mid-2012 to 2014 social worker, Joel Pettit, both testified that IH consistently struggled to give CH-K emotional feedback and connection. From October 2013 until March 2015, Jody Smetak was IH's state-provided mental health therapist. Smetak also worked with TK and IH together in couples' sessions. Smetak testified that IH did not acknowledge how her parental deficiencies lead to her children's dependencies, did not relate to CH-K in a developmentally appropriate way, bathed CH-K in a traumatic way, and could not focus on CH-K and AH-K at the same time. Smetak noted IH regressed or did not progress during treatment. IH also told Smetak on more than one occasion that she could not meet the needs of both children at the same time.

Erica Toth, who supervised IH's visitation before trial from 2014 to 2015, testified that IH had difficulty focusing on two children at once, had age-inappropriate conversation and play with CH-K, and yelled at CH-K for peeing on the floor. This substantial evidence supports the juvenile

court's finding that although IH may not have posed an imminent risk to CH-K even after receiving services, IH's progress was not sustained and there was little likelihood that she could remedy her parental deficiencies in the near future.

2. TK's LIKELIHOOD TO REMEDY PARENTAL DEFICIENCIES

Substantial evidence supports the juvenile court's finding that TK was unlikely to remedy his deficiencies to parent CH-K. TK's reliance on *C.B.* to support his argument that substantial evidence does not support the juvenile court's finding is unpersuasive. In *C.B.*, this court found a mother's primary parenting deficit was drug and alcohol addiction. 134 Wn. App. at 948. The mother entered a treatment program that she almost completed by the time of trial. *C.B.*, 134 Wn. App. at 948. While DSHS in *C.B.* argued that this was not enough progress to show the mother would improve conditions within six months to a year, 134 Wn. App. at 958, this court held that

> where a parent produces evidence that she has been improving over a four-month period after the State files a termination petition but before the termination hearing, the State may not rely solely on past performance to prove that it is highly probable that there is little likelihood that the parent will be reunited with her children in the near future.

134 Wn. App. at 953.

*C.B.* is distinguishable from TK's case. There, the State presented no evidence, other than past evidence, and testimony from a social worker that the mother would need to engage in anger management, demonstrate ongoing sobriety, and keep a safe, stable home. *C.B.*, 134 Wn. App. at 956. Here, the juvenile court was presented with substantial, past *and* recent evidence that T.K.'s deficiencies were ongoing and would take more than a year to improve.

There is a notable difference, too, between parental deficiencies due to drug and alcohol addiction as in *C.B.* and cognitive developmental disabilities as presented here. Michael O'Leary,

Ph.D. in clinical and forensic psychology, testified and his evaluation was admitted into evidence. O'Leary evaluated both parents in 2010 and opined that because the parents' deficiencies involve developmental, cognitive issues, it is unlikely that they will ever be able to remedy their resulting parenting deficits. O'Leary concluded that TK's inabilities interfere with his ability to learn, retain, and implement new parenting behaviors.

According to service providers and TK's own testimony, TK failed to acknowledge his parental deficiencies that led to his children's dependencies. O'Leary predicted in 2010 that TK's deficiencies would prevent him from providing his children with a safe, stable home and from anticipating hazards. Parent coaches Sullens from 2011 to 2012 and Shaune Putas from 2013 to 2104 assisted TK with developing parenting skills and cleaning up hazards in the home. But when Johnson visited the home a week before trial, the home was even more cluttered and hazardous than before.

Although TK showed more child development awareness than IH, he did not prevent IH from engaging in inappropriate behaviors with CH-K in his presence. And while TK decreased his work hours before the termination trial to help IH with the children, he planned to return to work full time if both CH-K and AH-K were returned to his and IH's care, leaving IH as the primary parent. Several providers who worked with TK between 2011 and 2015 also testified that TK was unable to make sustained progress from his services and could not parent two young children at once.

3.    REMEDY NOT IN THE NEAR FUTURE

Substantial evidence supports the finding that at the time of dependency, neither TK nor IH was likely to remedy their deficiencies in the near future. Johnson testified that as of the time

of trial, both TK and IH had regressed to old ways of thinking or functioning and it would take "years" before CH-K could be in their care. 9 Report of Proceedings (RP) at 1638. And O'Leary predicted in 2010 that because TK's and IH's deficiencies are developmental, cognitive issues, it is unlikely they will ever be able to remedy their resulting parenting deficits. A year or more is not in the near future for a three-year-old—CH-K's age at the time of trial. *A.W.*, 53 Wn. App. at 24, 32. We hold that substantial evidence supports the juvenile court's finding that there was little likelihood conditions could be remedied so CH-K could be returned to TK and IH's care in the near future under RCW 13.34.180(1)(e). *J.C.*, 130 Wn.2d at 428.

## D. DIMINISHED PROSPECTS FOR EARLY INTEGRATION

IH argues that the juvenile court improperly conflated the best interest factor and a finding that termination would help achieve permanent placement in the near future. TK argues that evidence before the juvenile court undermined the juvenile court's finding that he and IH placed CH-K into anxiety-inducing settings. We disagree.

Under RCW 13.34.180(1)(f), DSHS must prove that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." DSHS can prove RCW 13.34.180(1)(f) in one of two ways: (1) that prospects for a permanent home exist, but the parent-child relationship prevents the child from obtaining that placement or (2) that the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable home. *In re Welfare of R.H.*, 176 Wn. App. 419, 428, 309 P.3d 620 (2013).

Under the first method, "[RCW 13.34.180(1)(f)] is mainly concerned with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption; it is especially

a concern where children have potential adoption resources." *In re Dependency of A.C.*, 123 Wn. App. 244, 250, 98 P.3d 89 (2004). Under the second method, the juvenile court considers whether the child is emotionally and psychologically prepared to integrate into a stable and permanent home should one become available. *R.H.*, 176 Wn. App. at 428 (quoting *In re Dependency of K.D.S.*, 176 Wn. 2d 659, 294 P.3d 695 (2013).

Here, the juvenile court found that

> [c]ontinuation of the parent/child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. [CH-K] has been out of the parents' care for nearly her entire life. During this time, the parents have not corrected their deficiencies so that she can be returned to their care. The parents have repeatedly put their child into anxiety-inducing and emotionally-distraught settings. This child needs permanency and without termination of parental rights, the child will not be able to find a permanent home in the near future.

CP at 833.

First, contrary to IH's argument, the juvenile court made separate findings regarding RCW 13.34.180(1)(f) and CH-K's best interests. The best interest finding includes that "[t]ermination will allow [CH-K], as soon as possible, to enter into a stable family relationship where her individual needs can be met." CP at 834. But the inclusion of this language in the best interest finding does not mean the juvenile court conflated the best interest and RCW 13.34.180(1)(f) analyses: finding of fact 2.25 specifically addresses the juvenile court's findings in support of RCW 13.34.180(1)(f), and the juvenile court's best interest finding is supported by the juvenile court's eight-page ruling.

Second, TK's challenge to the juvenile court's finding that a continued relationship with the parents negatively affected CH-K goes to the weight placed on the evidence. TK argues that substantial evidence does not support the finding that TK and IH repeatedly placed CH-K into

anxiety-inducing and emotionally distraught settings where other evidence showed that he was a nurturing presence and offset IH's "less sensitive parenting." Br. in Supp. of Mot. for Accelerated Review at 47. But we do not weigh evidence on appeal. *A.G.*, 155 Wn. App. at 588.

Third, substantial evidence supports the finding that a continued relationship diminished CH-K's chances for permanent placement. DSHS proved a permanent home was available to CH-K, but a continued relationship with IH and TK could prevent her placement there. CH-K was out of her parents' care since birth in 2012 and never had unsupervised visits with her parents. CH-K had only one foster home, which was a preadoptive home. Johnson testified that the parental relationship between CH-K and her parents affected her ability to integrate into a permanent and stable home because CH-K would not be "legally free" to be adopted. 7 RP at 1321. Thus, substantial evidence supports a finding that at the time of dependency, the effect of continuing CH-K's legal relationship to her parents was an obstacle to a viable adoption. *A.C.*, 123 Wn. App. at 250.

Substantial evidence also supports a finding that DSHS proved that the parent-child relationship had a damaging and destabilizing effect. From 2012 to 2015, TK and IH did not consistently progress in their services to remedy parental deficiencies and many of the parents' service providers stated that CH-K should not be placed in their sole care. Johnson testified that remaining between two home environments stunted CH-K's development. And Johnson reported that while in CH-K's foster home, CH-K was talking, thriving, and developing at an average rate, but when CH-K was with her parents, there was concern she did not talk as much and regressed emotionally. TK and IH also repeatedly placed CH-K in distressing situations including bathing her in a traumatic manner and taking her to an emotional visitation review meeting with DSHS.

19

Substantial evidence thus supports a finding that a continued dependency may have had a damaging and destabilizing effect on CH-K's emotional and psychological state, negatively impacting her integration into a stable and permanent home. *R.H.*, 176 Wn. App. at 428.

### E. UNFITNESS TO PARENT

Both TK and IH argue that substantial evidence does not support the juvenile court's findings that they are unfit to parent CH-K. We disagree.

DSHS must establish by clear, cogent, and convincing evidence that the parent is currently unfit. *In re Welfare of A.B.*, 181 Wn. App. 45, 58, 323 P.3d 1062 (2014). To prove current unfitness, DSHS must show that the parent's deficiencies prevent the parent from providing the child with "'basic nurture, health, or safety.'" *A.B.*, 181 Wn. App. at 61 (quoting RCW 13.34.020); *see also In re Custody of B.M.H.*, 179 Wn.2d 224, 236, 315 P.3d 470 (2013) (holding a parent is unfit "if he or she cannot meet a child's basic needs").

The child's right to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of the dependency proceeding. RCW 13.34.020; *In re Dependency of J.A.F.*, 168 Wn. App. 653, 668, 278 P.3d 673 (2012). When the rights of basic nurture, physical and mental health, and safety of the child and legal rights of the parent are in conflict, the rights and safety of the child should prevail. RCW 13.34.020. If DSHS proves the elements of RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence, an implicit finding of current parental unfitness may be made. *K.N.J.*, 171 Wn.2d at 577.

Here, the juvenile court found that

the parents are not currently fit to parent this child. The parents have failed to adequately provide a safe and nurturing environment for this child on a consistent and sustained basis. The parents have repeatedly demonstrated an inability to put this child's emotional and developmental needs first. The parents have failed to

20

> consistently provide a safe home environment. Parental support from friends, family, or community members is not sufficient to overcome the parents' deficiencies that affect their ability to provide adequate care and supervision for this child.

CP at 834.

Regarding TK's deficiencies, the juvenile court also found that he has a cognitive disorder impairing his ability to make decisions, prioritize, and understand consequences. He is paranoid and has a "limited abilit[y] to process basic information, and has a lack of knowledge of general principles of childrearing and basic developmental concepts." CP at 830. These disorders and cognitive limits negatively impacted his parenting because he was rigid in his interactions with CH-K and IH, did not effectively communicate with IH or providers, did not consistently address his home environment, was compromised in his ability to manage stress, anger, and to deal with anxiety, and lacked insight into his and IH's limitations, putting CH-K's safety and healthy development at risk. Further, TK's interactions with CH-K "negatively impact[ed] the child's emotional development," and as he parented, he was unable to account for CH-K's normal, age-appropriate behavior. CP at 831.

1.      UNFITNESS PRESUMPTION

The first three elements of RCW 13.34.180(1) are undisputed and as addressed above, the remaining elements of RCW 13.34.180(d) through (f) were also proven by clear, cogent, and convincing evidence. Thus, an implicit finding of current parental unfitness may be made. *K.N.J.*, 171 Wn. 2d at 577. However, the parties' arguments related to unfitness are addressed below.

2.      UNFITNESS AS NONCUSTODIAL PARENT NOT A NECESSARY FINDING

IH argues that the juvenile court did not have substantial evidence to "prove she was currently unfit to be a *noncustodial* parent." Br. of Appellant at 20.

3.      SUBSTANTIAL EVIDENCE SUPPORTS FINDING THAT IH WAS UNFIT

Even if we address IH's arguments on the merits, substantial evidence supports the finding that IH is unfit.  Service providers testified that despite services offered between 2009 and 2015, IH lacked the ability to emotionally connect with CH-K, she put CH-K into distressing situations, interacted with CH-K in age-inappropriate ways, failed to remedy the safety and sanitation hazards in the home, and stated and exhibited that she cannot parent two children at once.  And from 2012 to 2015, IH did not consistently progress with her services to remedy parental deficiencies and several of her service providers stated that CH-K should not be placed in her sole care.  Thus, substantial evidence supports the juvenile court's finding that at the time of dependency IH was unfit to meet CH-K's basic needs.

4.      SUBSTANTIAL EVIDENCE SUPPORTS FINDING THAT TK WAS UNFIT

TK argues substantial evidence does not support the juvenile court's findings that he was unfit and its related findings, and he relies on *A.B.* for support.  But TK's arguments are unpersuasive.  In *A.B.*, this court stated that the existence of cognitive impairments is not proof that a parent is unfit unless the cognitive impairment directly impacts the ability to parent, and thus the question is whether the resulting parenting deficiencies can be corrected.  181 Wn. App. at 65.  There, DSHS failed to prove that the mother was unfit because it failed to prove that it was highly probable that her parenting deficiencies rendered her unable to provide for her child's basic needs.  *A.B.*, 181 Wn. App. at 64-65.

Here, unlike in *A.B.*, the juvenile court did not rely solely on TK's cognitive deficits, and substantial evidence supports the juvenile court's findings that TK's deficits rendered him unable

to provide for CH-K's basic needs.[8] The juvenile court relied on evidence that TK failed to provide a safe and nurturing home environment for CH-K on a consistent basis, that TK never recognized his or IH's deficiencies, which was problematic because IH would be CH-K's primary caretaker while he was at work, that TK could not handle the stress and tasks necessary to parent two children at once, and that neither parent had support sufficient to overcome their deficiencies. The juvenile court also relied on evidence that from 2012 to 2015, TK did not consistently progress with his services to remedy parental deficiencies, and his service providers stated that CH-K should not be placed in his sole care. Thus, the juvenile court's finding that TK was unfit is supported by substantial evidence.

Finally, contrary to TK's arguments, the related findings detailing TK's deficiencies were also supported by substantial evidence. O'Leary's report and testimony from subsequent providers support the findings regarding TK's cognitive disorder, the impediments it caused to his parenting, and his paranoia. Service providers also testified that he lacked knowledge of parenting and developmental concepts, that he interacted in a rigid manner with CH-K and IH, that he did not communicate effectively with IH or providers, that he was compromised in his ability to manage stress, anger, and to deal with anxiety, that he lacked insight into his and IH's limitations, and that his interactions with CH-K negatively impacted her development.

---

[8] TK points to evidence that his impairments and the home conditions posed no immediate or severe risk to CH-K's safety, that he acted in a nurturing manner towards CH-K, that he helped IH interact appropriately with CH-K, that he functioned well and without conflict at work, and that while he did not acknowledge his parenting deficiencies at trial or to service providers, his actions to resolve them "offset" his words. But we do not weigh evidence on appeal. *A.G.*, 155 Wn. App. at 588. Giving greater weight to other evidence rather than the evidence that TK emphasizes is not a juvenile court decision that we review. *A.G.*, 155 Wn. App. at 588.

We conclude that because the six required factors were proved by clear, cogent, and convincing evidence, the juvenile court's finding of unfitness is also implicitly supported by clear, cogent, and convincing evidence.

## F. BEST INTERESTS OF CH-K

Both parties challenge aspects of the juvenile court's "best interest" of the child finding. We disagree with the parties' challenges.

Although parents have a fundamental liberty interest in the care and custody of their children, the paramount consideration in a termination proceeding is the welfare of the children. *In re Welfare of Young*, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979).

The juvenile court has broad discretion to determine the best interests of the child and its decision is entitled to great deference. *Young*, 24 Wn. App. at 395. Where a parent has been unable to rehabilitate over a lengthy dependency period, a juvenile court is "'fully justified'" in finding termination in the child's best interests rather than "'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'" *T.R.*, 108 Wn. App. at 167 (alterations in original) (quoting *A.W.*, 53 Wn. App. at 33). The child's right to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of the termination proceeding. RCW 13.34.020.

Here, the juvenile court stated,

> [T]he parents are not currently fit to parent this child. The parents have failed to adequately provide a safe and nurturing environment for this child on a consistent and sustained basis. The parents have repeatedly demonstrated an inability to put this child's emotional and developmental needs first. The parents have failed to consistently provide a safe home environment. Parental support from friends, family, or community members is not sufficient to overcome the parents' deficiencies that affect their ability to provide adequate care and supervision for this child.

24

CP at 834. And

> [this] court finds by a preponderance of the evidence that termination of the parent/child relationship is in the best interest of the child. Termination will allow the child, as soon as possible to enter into a stable family relationship where her individual needs can be met.

CP at 834.

IH argues that the juvenile court improperly conflated the best interest standard and that termination would help achieve permanent placement in the near future. First, contrary to IH's argument, the juvenile court did not improperly conflate the best interest standard and that termination would help achieve permanent placement in the near future. Here, as discussed above, the juvenile court did not conflate the standards but instead made separate findings regarding impediments to CH-K obtaining permanency and CH-K's best interests. IH's argument fails.

TK argues that because "[DSHS] failed to establish each of the allegations under RCW 13.34.180(1), however, the trial court's 'best interests' determination was premature." Br. in Supp. of Mot. for Accelerated Review at 48. After proving the elements of RCW 13.34.180, DSHS must then prove by a preponderance of the evidence that termination of parental rights is in the best interests of the child. RCW 13.34.190(1)(b); *A.J.R.*, 78 Wn. App. at 228. Contrary to TK's argument, the finding that termination is in CH-K's best interests was not premature because as shown above, each factor to support termination was established by clear, cogent, and convincing evidence. Service providers who worked with TK and IH from 2009 to 2015 testified that the parents' progress with services was stagnant or would regress and that they did not recommend either parent have sole responsibility for CH-K.

The juvenile court had substantial evidence before it to support a finding that termination was in CH-K's best interests rather than leaving her in foster care for an indefinite period. *T.R.*, 108 Wn. App. at 167. We conclude that the parties' arguments fail and that the juvenile court's finding that termination was in CH-K's best interests was supported by a preponderance of evidence.

## II. NO DUE PROCESS VIOLATION

IH argues that the juvenile court violated her due process rights because the State had no compelling interest to support termination of her parental rights and termination was not the least restrictive alternative. We disagree.

The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." Parents have a fundamental liberty interest in the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Interference with this fundamental right is constitutional "'only if the State can show that it has a compelling interest and such interference is narrowly drawn to meet the compelling state interest involved.'" *In re Dependency of I.J.S.*, 128 Wn. App. 108, 116, 114 P.3d 1215 (2005) (quoting *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998), *aff'd sub nom. Troxel*, 527 U.S. 57). Consideration of whether an interference is narrowly drawn can include evaluation of whether a lawful alternative and less restrictive means could have been used. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6, 106 S. Ct. 1842, 90 L. Ed. 2d 260 (1986). Establishing the RCW 13.34.180(1) termination factors, and factor (e) in particular, by clear, cogent, and convincing evidence also satisfies

constitutional due process for terminating a parent's fundamental liberty interest. *K.R.*, 128 Wn.2d at 142.

## A. COMPELLING STATE INTEREST

IH argues that the government has no compelling interest at stake because the parents do not pose an imminent risk or threat to CH-K's welfare. We conclude that the State had a compelling interest.

In a termination proceeding, the State has a compelling interest to protect and prevent harm to children and has an obligation to intervene. *I.J.S.*, 128 Wn. App. at 116; *see also Santosky v. Kramer*, 455 U.S. 745, 766, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). When parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child. *I.J.S.*, 128 Wn. App. at 116. Establishing the child is dependent under RCW 13.34.180(1)(a) and that it is unlikely conditions can be remedied so the child can be returned in the near future under RCW 13.34.180(1)(e) is equivalent to finding harm to the child. *I.J.S.*, 128 Wn. App. at 118.

Here, as stated above, that CH-K was found dependent under RCW 13.34.180(1)(a) is undisputed. And because substantial evidence supports the finding that it is unlikely conditions can be remedied so that CH-K can be returned in the near future under RCW 13.34.180(1)(e), harm to CH-K has been established and the State had a compelling interest to intervene. *I.J.S.*, 128 Wn. App. at 118.

Substantial evidence also supports the State's compelling interest. Service providers testified that (1) the parents could not meet CH-K's emotional needs or relate to her in a developmentally appropriate way, (2) CH-K was developmentally stunted by straddling two homes, (3) conditions in the home remained hazardous to CH-K's safety, and (4) neither parent could provide sole care to CH-K. Thus, we conclude that IH's and TK's actions seriously conflict with the physical or mental health of the child such that the State had a compelling interest to intervene. *I.J.S.*, 128 Wn. App. at 116.

## B. LEAST RESTRICTIVE MEANS

IH also argues that termination was not narrowly tailored where DSHS could have pursued the less restrictive alternatives of (1) prolonging dependency to offer continued services, (2) pursuing a dependency guardianship, or (3) a third party custody order. We disagree.

Children have the right to basic nurture, which includes a speedy resolution of dependency proceedings. RCW 13.34.020. Thus, a petition for termination of parental rights must be filed whenever a child has been in foster care for 15 of the past 22 months unless compelling reasons excuse this requirement. RCW 13.34.145(1)(c). In 2010, the legislature created a more flexible alternative to parental termination—guardianship under RCW 13.36.040. *R.H.*, 176 Wn. App. at 423. Evidence of the availability of a guardianship is material to whether the State can meet its burden to prove RCW 13.34.180(1)(f), but it is not necessary for the State to disprove the availability of a guardianship placement. *R.H.*, 176 Wn. App. at 428. While recent case law does not appear to establish a requirement for parents to present evidence of a potential guardianship,

28

due process requires that parents have the ability to present all relevant evidence for the juvenile court to consider prior to terminating a parent's rights; thus, presentation of evidence regarding a potential guardianship or third party custodian would be considered by the juvenile court if raised. *See R.H.*, 176 Wn. App. at 429.

Here, CH-K was in foster care for three years as of 2015. The termination trial was continued five times between 2013 and 2015 to allow TK and IH to try to progress through the use of state services. But the 2013 to 2015 service providers did not recommend that the parents even receive unsupervised visits and reported that the parents regressed such that it would be years still before CH-K could possibly be in their sole care. IH offers no compelling reasons why the pretermination period should have been further extended beyond the statutory period in light of this evidence.

Additionally, the potential for guardianship placement or third party custody was never established by either parent at or before trial by testimony or petition. DSHS was not required to disprove the availability of a guardianship placement. *R.H.*, 176 Wn. App. at 428. And IH makes no argument why the juvenile court would have a similar obligation to disprove the availability of a third party custodian. IH's arguments that the State was required to pursue less restrictive means than termination fails.

We conclude that the juvenile court's findings were supported by substantial evidence and that constitutional due process was satisfied. *K.R.*, 128 Wn.2d at 142.

No. 47783-1-II

We affirm the juvenile court's order terminating the parties' parental rights to CH-K.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

BJORGEN, C.J.

MAXA, J.