# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 76202-8 -I |
| | ) | |
| M.-K.G.P. | ) | DIVISION ONE |
| DOB: 4/14/2014, | ) | |
| | ) | |
| Minor, | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| FAUNITENI PAUNI JR., | ) | |
| | ) | |
| Appellant. | ) | FILED: January 16, 2018 |

2018 JAN 16 AM 9: 53

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

MANN, J. — Fauniteni Pauni appeals the termination of his parental rights to his daughter, M.- K. P. He contends that the order terminating the parent-child relationship must be reversed because the Department of Social and Health Services (Department) failed to prove that he is currently unfit to parent and failed to prove other statutory factors by clear, cogent, and convincing evidence. He also challenges the constitutionality of RCW 13.34.180 and 13.34.190, the statutes governing termination of

the parent and child relationship. Substantial evidence supports the juvenile court's findings of current parental unfitness, the finding that all necessary and reasonably available services capable of correcting parental deficiencies were offered or provided, and the finding that termination was in the best interests of the child. And because Pauni fails to meet his burden to establish beyond a reasonable doubt that these statutes are unconstitutional, we reject his constitutional claim. We affirm.

## FACTS

Pauni and Kate Daniels were married in 2012. They have a son, N.P., born on February 28, 2013, and a daughter, M.-K. P., born on April 14, 2014. Daniels suffers from Huntington's Disease, a chronic illness which affects her executive functioning and results in some physical limitations. Pauni is also the father of three older children who are not in his care. Only M.-K. P. is the subject of this appeal.

Because of controlling and confrontational behavior they witnessed, bruising they observed, and incidents reported by their daughter, Daniels' parents were concerned about her safety during the marriage. On several occasions, Daniels sent text messages to her mother asking if she could return to the family home and Daniels' mother twice called the police when she arrived to pick up Daniels and N.P. and Pauni would not allow them to leave.

Child Protective Services (CPS) became involved with the family before M.-K. P. was born. In December 2013, Pauni and Daniels lost their housing. That same day, Joseph Summers, the director of a non-profit organization that serves the homeless, offered the family temporary housing in a trailer on his Port Orchard property. During the month that the family lived on Summers' property, Summers noticed that Pauni was

controlling towards Daniels and was very quick to "flare up" in anger. Also during this time, 10-month-old N.P. suffered a burn on his leg from a space heater while in Pauni's care. Pauni asked Summers to look at the injury and Summers advised Pauni that N.P. needed medical attention. Pauni responded he did not want CPS to become involved and the parents did not seek medical treatment for N.P. Because of this incident and because of Summers' concerns about Daniels' deteriorating health and Pauni's controlling behavior, Summers contacted law enforcement, Daniels' family, and Adult Protective Services. Daniels admitted to police officers that Pauni had hit her several times. As a result of Summers' intervention, the mother separated from Pauni and took N.P. with her to live at her parents' home. Shortly after, Daniels filed a petition to dissolve the marriage.

When M.-K. P. was born in April 2014, medical providers made a referral to CPS based on concerns about Daniels' ability to independently care for a newborn baby. Daniels reported to CPS investigators that she had been the victim of domestic violence and that Pauni had pushed and shoved her and punched her in the head, and that some of this violence took place when she was pregnant. Pauni, on the other hand, refused to discuss domestic violence because he said he did not want to implicate Daniels. M.-K. P. was placed in licensed foster care. She has never resided with either parent.

The court entered an agreed dependency order regarding M.-K. P. as to both parents in September 2014.[1] In an agreed dispositional order, Pauni was ordered to

---

[1] The dependency and dispositional orders are not in the record. In discussing these orders and other factual matters, both parties cite to trial exhibits throughout the briefing, but

participate in hair follicle testing for a period of time, to submit a urinalysis test, and to work with a public health nursing service if the child was placed in his care. The order included further requirements for drug testing and a chemical dependency evaluation if any test result was positive. In a separate contested dispositional order, the court ordered Pauni to obtain a psychological evaluation with a parenting component and to comply with all recommended treatment. That order also required Pauni to participate in homebuilders or similar in-home service if the child was placed in his care.

During the two-year dependency period, Pauni did not have permanent stable housing. He reported that he was homeless and primarily lived in transitional housing in Bremerton and then in Bellevue. Although he was employed throughout the dependency period, his employment was neither stable nor continuous. He had approximately eight different jobs and often held multiple jobs at the same time.

Based on negative drug testing, Pauni was not required to submit to further drug testing or obtain a substance abuse evaluation. And because his daughter was never placed in his care, Pauni was not required to participate in homebuilders or work with a public health nurse.

The Department referred Pauni to Dr. Steven Tutty who performed a psychological evaluation in February 2015. According to Dr. Tutty, Pauni reported a history of attention deficit hyperactivity disorder (ADHD), and his test results showed executive functioning impairments consistent with that report, indicating challenges with

---

exhibits are not included in the record on appeal. There do not appear to be any factual disputes with regard to the trial exhibits and they are not necessary to our disposition of the case. Nevertheless, we remind the parties that they must verify that the cited evidence is included in the appellate record. See RAP 10.3(a)(5).

attention, focus, and impulsivity. With respect to other diagnostic portions of the testing, including personality testing and the child abuse potential inventory test, Dr. Tutty was unable to evaluate Pauni because his responses were "highly defensive," and revealed an attempt to "grossly manipulate" how others view his character. Dr. Tutty was thus only able to diagnose ADHD, but noted that other conditions were possibly present, if not masked by Pauni's lack of transparency and manipulation.

As part of his evaluation, Dr. Tutty interviewed Daniels who again stated that Pauni engaged in acts of domestic violence during the marriage. Pauni categorically denied domestic abuse. But Pauni reported that his biological father was "highly abusive" and admitted to a history of violent acts, including an unprovoked serious violent attack when he was a teenager.

Dr. Tutty identified Pauni's executive functioning impairment, his level of defensiveness, and his history of domestic violence as parental deficiencies. Dr. Tutty explained that Pauni's cognitive impairments, when viewed in conjunction with his high level of defensiveness, indicated a lack of insight into psychological challenges and parenting deficits and would have a tendency to affect his motivation to complete treatment and ability to effectively apply and incorporate skills learned in treatment. Dr. Tutty opined that exposure to domestic violence negatively affects children and often leads to posttraumatic stress disorder (PTSD) and depression. Dr. Tutty further explained that lapses in visitation erode the parent-child bond.

Based on his evaluation, Dr. Tutty recommended that Pauni engage in counselling to address ADHD, and his history of domestic violence, propensity for anger, and impulsivity. Dr. Tutty specifically recommended individual counselling

because he believed it would be more effective than a class setting in view of Pauni's high level of positive impression management. Dr. Tutty recommended that Pauni consult a physician for a medication assessment to explore possible drug treatment for his ADHD symptoms. Due to his history of inconsistent parenting, Dr. Tutty also recommended that Pauni complete a parenting class. Pauni completed a parenting class.[2] However, he did not complete the treatment recommended by Dr. Tutty.

The Department referred Pauni to Kitsap Mental Health and in 2015, he had an intake assessment to determine his eligibility for services provided by that agency. Pauni was eligible for numerous services, based in part on his report that he suffered from PTSD. Those services included assistance with case management, housing, employment and/or financial benefits, possible medication management/psychiatric consultation, and individual therapy. Following the intake, according to the agency's records, Pauni met with a case manager four times between May and August 2015. He did not provide any reports to the Department or a release of information with respect to these meetings.

Pauni participated in some services in 2016 with a mental health and domestic violence counselor, Sandra Bruno. Bruno conducts a year-long, group-based domestic violence program that was already underway when Pauni contacted her. Pauni did not provide any court document or Dr. Tutty's evaluation to Bruno, but said he wanted to participate in order to "stop all of the abuse from [his] ex-wife." Pauni attended 10 sessions focused on parenting. Pauni abruptly stopped attending the

---

[2] As the juvenile court noted, although a developmental parenting class was recommended, Pauni completed a different class focused on raising a "spirited child."

-6-

classes, and although Bruno tried to contact him, he never returned her calls. The social worker spoke with Bruno and determined that the program she offered did not satisfy Dr. Tutty's treatment recommendation.

In January 2016, the Department filed a petition to terminate Pauni's parental rights.[3] In July of 2016, following a dependency trial related to N.P., the court incorporated Dr. Tutty's recommendations in the dispositional order. In addition to individual mental health counselling and a medical evaluation, the court specifically ordered Pauni to participate in Moral Reconation Therapy and spoke at length about why the court was ordering this treatment.[4] The Department provided a referral for the service. Upon completion of 60 days of targeted mental health treatment and a medication assessment, the court ordered Pauni to obtain an updated psychological evaluation. He did not participate in the prerequisite services nor did he obtain a new evaluation. Pauni did show up unannounced at the Department's offices one day shortly after the July 2016 dependency trial, but then abruptly left in the middle of a discussion with the social worker, when the social worker briefly stepped away to retrieve bus tickets and a copy of the court's dependency order for him.

At the time of trial of the Department's petition in October 2016, M.-K. P. was two and a half years old. Pauni had not seen her in more than six months. Two social workers assigned to the case during the dependency period testified at trial. According to the social worker assigned to the case for more than a year, although Pauni appeared to have "immense love" for his children, he visited M.-K. P. only intermittently

---

[3] The petition also sought to terminate the parental rights of the mother. The mother later relinquished her parental rights and is not a party to this appeal.

[4] Pauni attended N.P.'s dependency trial, but at the termination trial a few months later, insisted he had never heard of Moral Reconation Therapy.

during the dependency. Several visitation contracts were terminated by supervisors due to missed visits and cancellations without sufficient notice. Visit supervisors reported some concerning behavior during visits, such as making "inappropriate passes" at them, being distracted during visits, and disrupting the visits of other families. At times, Pauni was unsure of how to safely parent and would ask the supervisor what to do.

In 2016, Pauni said he could no longer attend visits on weekdays and was only available on Sundays. However, Sunday visits were not feasible because of the unavailability of professional supervisors and a conflict with M.-K. P.'s established schedule. Pauni refused to cooperate with the social worker's attempts to verify his schedule or identify other potential times that visitation could occur. Pauni mentioned that some people from his church might be willing to supervise visits, but he did not provide names or contact information to the social worker.

Pauni testified that since the summer of 2016, he was working as a security guard on weekend nights for approximately 8 hours per week and worked slightly less than 40 hours per week at a hotel as a bellhop. He said his schedule changed weekly, that some of his shifts were on weekends, and that his employer was "family oriented" and flexible when he required time off. Pauni testified that he had been living for approximately a month in a residence with his fiancé, whom he had known for about two months. He had not participated in any services since the July 2016 dependency trial or visited his daughter. He described his recent efforts toward reunification as follows: (1) he had secured housing with his new fiancé, (2) he changed jobs so he had more time

-8-

available to see his children, and (3) he maintained contact with the Department for the purpose of scheduling visits.

When asked about domestic violence, Pauni testified that he hit Daniels on only one occasion, in self-defense, when he "was tired of being a punching bag." He conceded that there was "really bad" domestic violence in a prior relationship, but at the same time, said he was also a victim and that he grabbed and threw his former partner only because she was hitting him.

Pauni testified that Crohn's disease and depression were major obstacles that prevented him from completing the required services and maintaining consistent contact with his child, even though he had not mentioned these conditions to the Department, the court, Dr. Tutty, or any other treatment provider in the course of the dependency. Pauni also said he was unable to reduce his work hours because 60 to 70 percent of his wages were garnished to pay child support.

Pauni's report of services he participated in was also at odds with the Department's records and the testimony of other witnesses. For instance, Pauni said that in addition to the group sessions, he had individual counseling sessions with Bruno, but Bruno did not corroborate his claim. Pauni also represented that he had "countless" individual counselling sessions with the case manager at Kitsap Mental Health and "a lot of counselling" with his pastors about reconciling with his wife. Pauni said he attempted to obtain a medication evaluation, but the treatment provider did not have authorization to prescribe medication for ADHD.

According to the social worker primarily assigned to the case, Pauni's parental deficiencies included his domestic violence history, and his failure to acknowledge it or

-9-

recognize its impact on his children. His deficiencies also included the failure to visit his child in months and his failure to recognize the detrimental effect. Another parental deficiency was Pauni's failure to secure adequate housing that would accommodate his child. The social worker said that Pauni's actions, or lack thereof, showed that he did not prioritize his children and demonstrated a lack of motivation to care for them and a failure to accept responsibility for them. The social worker believed there was no likelihood that Pauni would be able to correct his parental deficiencies within the foreseeable future and recommended terminating Pauni's parental rights.

The juvenile court entered an order terminating Pauni's parental rights. He appeals.

## ANALYSIS

Pauni challenges the termination order, arguing that the Department failed to present sufficient evidence to support several of the juvenile court's findings.

Parents have a fundamental liberty and privacy interest in the care and custody of their children. In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995). Thus, terminating parental rights should be allowed only "'for the most powerful reasons.'" A.J.R. 78 Wn. App. at 229 (internal quotation marks omitted) (quoting In re Welfare of Sego, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)).

Washington courts use a two-step process when deciding whether to terminate parental rights. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190. First, the Department must show that the statutory requirements in RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. A.B., 168

-10-

Wn.2d at 911. The statutory requirements that the Department must allege and prove by clear, cogent, and convincing evidence are set forth in RCW 13.34.180(1):

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.
>
> . . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

Evidence is clear, cogent, and convincing if it shows the ultimate fact at issue is highly probable. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). On review, the trial court's findings will not be overturned if supported by substantial evidence. K.S.C., 137 Wn.2d at 925. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the declared premise. In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006). This court does not make credibility determinations or weigh evidence on review. C.B., 134 Wn. App. at 953. "The trial judge has the advantage of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." K.S.C., 137 Wn.2d at 925.

Second, once the court concludes that the Department has established the factors of RCW 13.34.180(1) by clear, cogent, and convincing evidence, it must then consider whether terminating parental rights is in the best interest of a child. A.B., 168 Wn.2d at 911. The Department must establish by a preponderance of the evidence that termination is in the best interest of the child. RCW 13.34.190(1)(b). "Only if the first step is satisfied may the court reach the second." A.B., 168 Wn.2d at 911.

*Parental Unfitness*

In addition to establishing the six factors of RCW 13.24.180(1), due process requires the trial court to explicitly or implicitly find by clear, cogent, and convincing evidence that the parent is currently unfit. A.B., 168 Wn.2d at 918-19. Current parental unfitness may be implicitly established when the Department proves all six of the statutory elements. In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011). A court may also explicitly make a finding of current parental unfitness. A.B., 168 Wn.2d at 920-21. Parental deficiencies alone do not render a parent currently unfit, "[t]he proper inquiry is whether the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety." In re Parental Rights to K.M.M., 186 Wn.2d 466, 493, 379 P.3d 75 (2016). Here, the trial court made a detailed and explicit finding of current parental unfitness, a finding we review for substantial evidence:

> The father is incapable of providing for the child [M.-K. P.'s] emotional, physical, mental and developmental needs. The father is incapable of safely parenting the child and is currently unfit to parent the child. As testified by Dr. Tutty, children are best served by "a predictable, stable, safe, adequately structured, and consistently nurturing home environment." The father's propensities towards domestic violence remain unresolved. The father's testimony that the mother (who is half his size

-12-

and presents with significant physical infirmities) was a daily aggressor against him, and that he only physically defended himself one time, is not credible, especially in light of the fact that he made the same claim about the mother of another one of his children. In addition both [Daniels' mother] and Mr. Summers testified to the father's propensity to [] anger and his intimidating presentation, and the father admitted his history of impulsive violent behavior as a youth to Dr. Tutty. The father needs to come to grips with his anger issues before he can safely parent a child. As Dr. Tutty explained, children who witness domestic violence are subject to potential physical harm, as well as emotional harm, that can negatively affect their proper development. The father has failed to maintain a stable home appropriate for placement of a child. He testified that he has been financially unable to do so due to garnishment for child support, but the levels of garnishment he claims are not credible in light of the controlling statute, and he provided no supporting documentation. The father's failure to secure appropriate housing for a child is not due solely to poverty; other issues are involved, potentially focus issues identified by Dr. Tutty or perhaps other issues that Dr. Tutty was unable to identify because the father was not forthcoming in the testing process. His current housing depends on the continuation of his very new relationship with his fiancée, whom he has known for 2 months and whom he asked to marry him after 2 weeks, despite the fact that as recently as July he was seeking to reconcile with Ms. Daniels. It is also concerning that the father responded to [the social worker] that he did not believe that his lack of visitation with the child was harmful to the child. The father's failure to attend any visitation with his child for months demonstrates that he is unable to focus on the needs of his children over his own needs, and that he is clearly unable to take the much greater responsibility of parenting a child full-time.[5]

Pauni claims that the record does not support this finding. He contends that there was no evidence that any mental health issue or domestic violence adversely affected M.-K. P. or his ability to parent. Thus, he claims that there was no connection between the parental deficiencies identified by the court and his parenting abilities. He points to the testimony of some witnesses who said they observed appropriate parenting in the context of supervised visits or an evaluation. Pauni also maintains

---

[5] In addition to challenging this finding, Pauni assigns error to 18 other findings made by the juvenile court. We address the findings only to the extent that Pauni provides specific argument in his briefing. See Brown v. Vail, 169 Wn.2d 318, 336, n.11, 237 P.3d 263 (2010) (citing Cowiche Canyon Conservancy v Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992)); RAP 10.3(a)(6).

there is no evidence that inattentiveness contributed to the burn injury sustained by N.P. With regard to alleged domestic violence, Pauni claims there is no evidence or allegations that M.-K. P., or any of his children, were the target of violence or anger or witnessed domestic violence.

Nevertheless, the record supports the court's finding that Pauni's untreated anger and domestic violence issues created a risk to M.-K. P.'s safety and welfare. This is particularly true because of evidence that violence was a long-standing issue for Pauni, there were domestic violence issues in his prior relationship, his explanation and attempt to deflect blame was implausible, and because Pauni failed to recognize the dangerousness and seriousness of his acts of domestic violence. While it is true that there was no evidence that his daughter was a victim of domestic violence or witnessed such violence, it is also true that M.-K. P. was never in Pauni's care and all of his contact with her was professionally supervised. Contrary to Pauni's argument, the risk to M.-K. P. was not merely speculative.

With regard to Pauni's mental health, the court did not conclude that he was unfit to parent solely because of a mental health condition. However, the court determined that Pauni's ADHD, and possibly other conditions that could not be diagnosed, potentially contributed to his failure to secure adequate housing, to engage in recommended treatment, and maintain consistent and continuous contact with his child. In sum, Pauni was unfit because of the cumulative effect of his untreated domestic violence and anger, untreated mental health condition, and inability to prioritize the needs of his child as evidenced by his sporadic contact with her and the failure to take

steps toward securing adequate housing. Substantial evidence supports the court's determination of unfitness.

### Necessary and Reasonably Available Services

To meet its burden under RCW 13.34.180(1)(d), the Department had to establish that it offered or provided Pauni with the required services, and that he either failed to engage or waived his right to such services. In re Welfare of S.V.B., 75 Wn. App. 762, 770, 880 P.2d 80 (1994). The juvenile court made several findings with regard to this statutory factor, including the following:

> Services offered under RCW 13.34.130 have been expressly and understandably offered or provided to the father. The emails, letters and testimony of the social workers demonstrate the extraordinary efforts to engage and/or confirm the father's reported engagement in services.
>
> . . . .
>
> All necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided to the father. Neither the father, the CASA nor the Department have indicated the need for remedial services for the father other than those previously ordered by the court in the dependency cases of [M.-K. P.] and her sibling, [N.P.]. The father indicated that he had requested marriage counseling at some point in the beginning of [M.-K. P.'s] dependency, however, that is not a remedial service to promote reunification between parent and child. The father requested housing assistance, and testified that social worker Alicia Adiele did assist him in locating some housing resources.

Pauni challenges these findings. He claims that the Department failed to meet its burden under RCW 13.34.180(1)(d) because, although the court identified his lack of stable housing as parental deficiency, the Department failed to provide him with adequate housing assistance. According to Pauni, lack of permanent housing affected his ability to participate in treatment and services and regularly visit M.-K. P. And the

Department failed to address this barrier by merely providing him with a list of online resources.

Pauni relies on Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs., 133 Wn.2d 894, 924, 949 P.2d 1291 (1997). In that case, the Washington Supreme Court held: "[A] juvenile court hearing a dependency proceeding has authority to order [the Department] to provide the family with some form of assistance in securing adequate housing in those cases where homelessness or lack of safe and adequate housing is the primary reason for the foster placement or the primary reason for its continuation." Coalition for the Homeless, 133 Wn.2d at 924.

But homelessness was not the primary parental deficiency that prevented reunification in this case. As explained, the parental deficiency was the combined effect of Pauni's unacknowledged and unaddressed domestic violence and anger, untreated mental health condition, and inability to prioritize the needs of his child.

The record also reveals that Pauni failed to utilize the housing assistance resources that were available to him. For example, around the time of the dependency, Pauni was employed by Home Depot and represented to the social worker that he was eligible for housing assistance through the employer. For unknown reasons, he failed to obtain assistance through that program. Pauni was also eligible for housing assistance through the Department's referral to Kitsap Mental Health Services. But he only worked with a case manager for a period of a few months and did not utilize the housing services offered by that organization. In the summer of 2016, Pauni estimated that he was a couple of weeks to a month away from accumulating the funds he needed to secure stable housing. At trial, he said that he had recently qualified for housing

through another program but left that program because the timeframe would not work and because his fiancé invited him to live with her. A parent's unwillingness or inability to avail himself or herself of remedial services within a reasonable period is highly relevant to the determination of whether the elements of RCW 13.34.180 are established. In re Dependency of C.T., 59 Wn. App. 490, 499, 798 P.2d 1170 (1990).

As the juvenile court noted, the causes for Pauni's homelessness did not appear to be simply financial. Pauni was employed throughout the dependency, often held multiple jobs, and provided conflicting explanations for his lack of stable housing. Pauni did not request housing assistance from either of the social workers who testified at trial. And although Pauni had apparently moved into housing that could accommodate his child by the time of trial, he did not notify the Department or take any steps to further M.-K. P.'s placement with him.

Under these circumstances, there are no reasonable grounds to believe that additional housing services would have remedied Pauni's parental deficits. Substantial evidence supports finding the Department timely offered or provided all necessary services capable of correcting Pauni's parental deficiencies.

Pauni also challenges the court's finding that there is little likelihood that conditions will be remedied so that the child can be returned to him in the near future and its finding that continuation of the parent-child relationship diminishes the child's prospects for early integration into a stable and permanent home. See RCW 13.34.180(1)(e), (f). He argues that it was "premature or incorrect" to enter these findings because they are predicated on unsupported findings that he was currently unfit

-17-

to parent M.-K. P. and that the Department provided all necessary services that were reasonably available. Because we disagree, these claims also fail.

*Best Interest*

The court entered the following finding regarding the best interest of the child:

> Termination of parental rights is in the best interest of this young child. The father will not be able to remedy his parental deficiencies within the near future. The child, [M.-K. P.], has a right to a safe, stable, and permanent home and to a speedy resolution of this termination proceeding. The child's CASA also supported termination of Mr. Pauni's parental rights as being in [M.-K.P.'s] best interest.

In determining the best interest of the child, the juvenile court also expressly considered the fact that the present placements of M.-K. P. and her sibling have a strong relationship and have indicated mutual intent to continue to support sibling contact posttermination.

The determination of whether termination of parental rights is in the child's best interests is a fact specific inquiry. In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'" In re Dependency of T.R., 108 Wn. App. 149,167, 29 P.3d 1275 (2001) (alterations in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). "When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020.

Pauni maintains that the court did not identify any parental deficiency that warranted termination and it was not in his daughter's best interest to terminate the parent-child relationship. However, while there was evidence that Pauni expressed love for his child and a desire to provide a stable home for her, the juvenile court concluded that those expressions did not outweigh the child's need for permanence and stability. The evidence established that Pauni failed to consistently visit his daughter and failed to make progress in approximately two years in addressing his domestic violence, anger issues, or mental health. While Pauni stated on multiple occasions that he was motivated to do whatever was needed in order to reunify with M.-K. P., he did not engage in the recommended counselling or mental health assessment and did not take steps to secure housing that would allow him to care for his child. And for a substantial period of the dependency, he did not see M.-K. P. even once. There is no basis to disturb the court's finding by a preponderance of the evidence that termination of parental rights was in the child's best interests.

*Constitutionality of Termination Statutes*

Pauni argues that RCW 13.34.180 and 13.34.190 are unconstitutional because the statutes are not narrowly drawn to achieve a compelling state interest. Specifically, he contends that because the statutes do not require proof that adoption is imminent, they permit termination of parental rights without a showing that such termination is necessary, or is the "least restrictive means capable of preventing harm to the child." Applying the standard of strict scrutiny to this case, we hold that these statutes are not unconstitutional.

This court reviews challenges to the constitutionality of a statute de novo. In re Welfare of A.W., 182 Wn.2d 689, 701, 344 P.3d 1186 (2015). A statute is presumed to be constitutional, and the party challenging that presumption bears the burden of proving beyond a reasonable doubt the statute is unconstitutional. A.W., 182 Wn.2d at 701. One asserting a facial challenge to a statute must also prove "no set of circumstances exists in which the statute, as currently written, can be constitutionally applied." In re Dependency of I.J.S., 128 Wn. App. 108, 115-16, 114 P.3d 1215 (2005); McDevitt v. Harborview Medical Center, 179 Wn.2d 59, 74, 316 P.3d 469 (2013).

A parent has a fundamental liberty interest in the care and custody of his children. In re Dependency of J.H., 117 Wn.2d 460, 473, 815 P.2d 1380 (1991). The State may only interfere with this interest if it has a compelling interest and the statutes are narrowly tailored to meet only that compelling state interest. In re Parentage of C.A.M.A., 154 Wn.2d 52, 57, 109 P.3d 405 (2005). "Washington allows State interference with a parent's protected right to raise her children only where the State seeks to prevent harm or risk of harm to the child." In re Welfare of C.B., 134 Wn. App. 336, 343, 139 P.3d 1119 (2006).

This court has rejected a number of similar claims that the statutes governing termination do not require the Department to establish that termination is the least restrictive means to address compelling state interests and therefore unconstitutionally violate a parent's fundamental liberty interest. See In re Welfare of L.N.B.-L., 157 Wn. App. 215, 256-57, 237 P.3d 944 (2010) (rejecting the argument that the statute is unconstitutional because it does not require the juvenile court to consider less restrictive alternatives such as a temporary continuation of the dependency, dependency

guardianship, third-party custody, or open adoption prior to termination); In re Welfare of M.R.H., 145 Wn. App. 10, 31, 188 P.3d 510 (2008) (rejecting the argument that the statute is unconstitutional because it does not require the juvenile court to consider whether the less restrictive alternatives of guardianships or open adoptions would be harmful); In re Dependency of T.C.C.B., 138 Wn. App. 791, 797-800, 158 P.3d 1251 (2007) (rejecting the argument that the termination statutes are not narrowly tailored to achieve a compelling state interest because they do not require only that degree of regulation necessary to prevent harm); C.B., 134 Wn. App. at 343-46 (rejecting the argument that the termination statutes are not narrowly drawn because the statutes allow termination without first showing that no less restrictive alternatives exist, namely dependency guardianship); I.J.S., 128 Wn. App. at 118, 119-21 (rejecting the argument that the State must prove that dependency guardianship is not a viable alternative to termination, regardless of whether a dependency guardianship petition has been filed). This court's rationale in I.J.S. is representative: "[T]he termination statutes are narrowly drawn because the State must prove that the relationship with the parents harms or potentially harms the child before the court can terminate parental rights." I.J.S., 128 Wn. App. at 118; M.R.H., 145 Wn. App. at 31; C.B., 134 Wn. App. at 345.

Nevertheless, Pauni claims that the only compelling state interest served by the "full termination" of parental rights is "achieving permanency for the child through adoption to prevent the specific harm of ongoing instability." He maintains that the State's interest in achieving such permanency could be addressed without terminating parental rights prior to adoption. For instance, he suggests that the juvenile court could terminate some of the biological parent's rights, such as the right to object to future

adoption, and could then terminate the parent's full rights simultaneously with the adoption. Pauni asserts that terminating the parental relationship before adoption merely eliminates one potential avenue for achieving permanency for the child.

RCW 13.34.180(1)(f) requires the Department to prove that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. Pauni argues that this provision does not sufficiently narrow the scope of the termination statue because it does not require specific proof that a permanent adoptive home is available at the time of termination and only achieves a "slight theoretical increase in the likelihood of adoption." In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013). The Department may satisfy RCW 13.24.180(1)(f) by proof that (1) prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement or (2) the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement. In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013). The statute recognizes that continuation of the legal parental relationship is a barrier to adoption and that there is a limited timeframe for establishing permanency which cannot be achieved until parental rights are terminated. Pauni's argument fails to appreciate that adoption presupposes termination of the rights of biological parents and that continuation of the legal relationship undermines the child's right to permanency when the factors under RCW 13.34.180(1) are satisfied. T.C.C.B., 138 Wn. App. at 800; RCW 26.33.100; RCW 26.33.260(1).

It is Pauni's burden to establish that no set of circumstances exists in which the statute can be constitutionally applied. The factual circumstances here further undermine his argument because according to the evidence, M.-K. P. was placed in a preadoptive home where her caregiver had been investigated and approved by the Department to become an adoptive parent when and if she became available for adoption. Pauni has failed to prove beyond a reasonable doubt that RCW 13.34.180 and 13.34.190 are unconstitutional.

Affirmed.

_Mann, J._

WE CONCUR:

_Appelwick, J_

_Cox, J._