# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>B.D.M.B.,<br><br>          Minor Child.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>          Respondent,<br><br>          v.<br><br>KELLI BURNS and BRANDON<br>BURNS,<br><br>          Appellants. | No. 80429-4-I<br>(consolidated with No. 80585-1-I)<br><br><br>ORDER DENYING MOTION<br>FOR RECONSIDERATION AND<br>WITHDRAWING AND<br>SUBSTITUTING OPINION |

The appellants, Kelli Burns and Brandon Burns, have filed separate motions for reconsideration of the opinion filed on September 28, 2020. The court has determined that the motions should be denied, but the opinion should be withdrawn and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration filed by Kelli Burns is denied; and it is further

ORDERED that the motion for reconsideration filed by Brandon Burns is denied; and it is further

ORDERED that the opinion filed on September 28, 2020 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

_Appelwick, J._

_Andrus, A.C.J._　　　　　_Dwyer, J._

FILED
11/23/2020
Court of Appeals
Division I
State of Washington

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>B.D.M.B.,<br><br>                Minor Child.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>              Respondent,<br><br>       v.<br><br>KELLI BURNS and BRANDON BURNS,<br><br>              Appellants. | No. 80429-4-I<br>(consolidated with No. 80585-1-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — After a dependency of more than four years, the trial court terminated Kelli's and Brandon's parental rights to B.D.M.B. Kelli contends the termination statutes, RCW 13.34.180 and .190, are unconstitutional as applied to this case. She also contends that the Department did not prove all statutory elements or that termination was in the best interests of the child. Brandon claims the Department failed to prove that it offered or provided all necessary services capable of correcting his parental deficiencies and that he was currently unfit to parent B.D.M.B. We affirm.

FACTS

This appeal concerns B.D.M.B., the middle child of Kelli Burn's and Brandon Burn's three children.[1] B.D.M.B. was born in January 2010 and has "seen a lot in her little life."

Within the first six years of her life, B.D.M.B. observed her parents frequently drinking to the point of intoxication, Kelli cutting and stabbing Brandon, and Brandon breaking Kelli's nose multiple times. Kelli and Brandon also subjected B.D.M.B. to acts of physical violence, emotional abuse, and neglect. During this time, the family had several encounters with law enforcement, had numerous Child Protective Services referrals, and received various family support services. These early years of constant chaos and domestic violence caused B.D.M.B. to suffer from posttraumatic stress disorder (PTSD).

In December 2014, the Department of Social and Health Services (Department)[2] removed B.D.M.B. from Kelli's and Brandon's care and filed a dependency petition. B.D.M.B. was initially placed into foster care.

In January 2015, Kelli and Brandon agreed to the entry of a dependency and dispositional order placing B.D.M.B. in relative care. The parties stipulated to the facts establishing dependency and the court entered an agreed dependency order for B.D.M.B.. The court ordered Kelli and Brandon to participate in domestic

---

[1] Although the record reveals B.D.M.B.'s siblings share a similar childhood experience, we summarize the facts as related to B.D.M.B. only.

[2] As of July 1, 2018, child welfare functions were transferred from the Department of Social and Health Services to the Department of Children, Youth, and Families. See RCW 43.216.906. We refer to both as "the Department."

violence services, substance abuse treatment, and random urinalysis (UAs). The court authorized weekly visitation for Kelli and Brandon.

In March 2015, the Department later placed B.D.M.B. with her paternal grandmother. At that time, the court found both parents were making progress towards reunification and expanded visitation to include weekend visits.

In August 2015, after Kelli and Brandon successfully completed all court-ordered services, B.D.M.B. was returned to her parents' care for a "trial in-home placement." But, by December 2015, the parents relapsed into alcohol abuse and family violence.

In January 2016, B.D.M.B. was again removed from the parents' care and placed her with the paternal grandmother. B.D.M.B. remained in this placement throughout the remainder of the dependency proceedings.

At a February 2016 review hearing, the court ordered Kelli to continue substance abuse treatment, complete random Urinalysis (UA), attend sober support meetings, participate in domestic violence service and in a "Parenting After Violence" class, and continue in family counseling. The court ordered Brandon to participate in an updated substance abuse evaluation and in an "Effects of Violence on children" class, complete random UAs and a domestic violence batterer's assessment, and undergo individual mental health counseling. The court later required the parents to complete a Foster Care Assessment Program (FCAP) to examine reunification barriers, and changed B.D.M.B.'s primary permanent plan to adoption with an alternative plan to return home to the parents.

In September 2016, an FCAP report was completed. According to that report, Kelli and Brandon denied alcohol abuse during B.D.M.B.'s trial return home. Relatedly, the report determined: "It will be difficult to see a decrease in [B.D.M.B.'s] PTSD arousal scores until there is acknowledgement by [the parents] of the impact of the abuse and their past behavior has had had on their children, and her permanent placement is determined." The report also stated in pertinent part:

> Reunification is not recommended. The family has been provided with a significant level of services over time and there are no additional services for the parents that could result in a recommendation for reunification within the mandated time frame for these three siblings. Encourage the parents to relinquish parental rights and adoption by [the paternal grandmother]. If the Court determines that reunification should occur, then Alternatives for Families: a Cognitive Behavior Therapy (AF-CBT) is the evidence-based treatment intervention designed to improve the relationships between children and caregivers in families involved in arguments, frequent conflict, physical force/discipline, or child physical-abuse. [Kelli and Brandon] are not currently good candidates for AF-CBT, because they have continued to deny their behavior.

In October 2016, the Department filed a petition to terminate Kelli's and Brandon's parental rights to B.D.M.B. The petition alleged that the Department offered numerous services to the parents, including: drug and alcohol evaluations, substance abuse treatment, random UAs, domestic violence assessment and treatment, Parenting after Violence class, family counseling, mental health assessments and services, age-appropriate parenting education, case management services and monitoring, assisting caregiver services, and facilitating

4

implementation of services. The petition also alleged, despite the Department's provision of these services, the parents were not fit to parent B.D.M.B. due to

> the following parental deficiencies that have not been corrected and necessitate termination of parental rights as to the parents: history of substance abuse, domestic violence, mental health issue, and a lack of parenting skills. For these reasons, the parents do not understand and are incapable of providing for their child's emotional, physical, mental and developmental needs. The parent [are] incapable of safely parenting the child.

In December 2016, for the first time, Kelli and Brandon acknowledged their relapse on alcohol abuse in December 2015. Not only did Kelli and Brandon refuse to disclose their relapse to their respective service providers for an entire year, they also maintained that B.D.M.B. was lying about witnessing their relapse and return to violence during the trial return home.

In March 2017, the assigned Department social worker, Zavtra Adams, began inquiring into AF-CBT services as suggested in the FCAP report since the parents had recently acknowledged their relapse. Adams eventually contacted two potential service providers, one in King County and another in Snohomish County. Both service providers declined the referrals. The King County provider indicated that reunification needed to be imminent in order to be effective, "the children needed to be in home for a large portion of that timeframe," its program required weekly sessions and travel to King County (from Whatcom County). The Snohomish County provider advised that its program was only for families traumatized by events such as a house fire or a murder, and did not offer a program for family reunification.

5

In April 2017, even though it was not yet a court-ordered service, Adams started searching for family counseling options. Before this time, B.D.M.B.'s individual therapist did not recommend family counseling due to the child's fear of her parents. In June 2017, the Department retained family therapist Victoria McGuinness, noting the following as the presenting issue: "They are being referred for family therapy at the request of the parents in support of reunification efforts." But, after initial and separate meetings with B.D.M.B. and the parents, McGuinness determined that she was "unable to proceed" for two reasons. The first was due to B.D.M.B.'s "level of resistance and her fears with regard to family therapy." The second was "the parents' insistence that it be reunification therapy, that was not the goal. The goal was to rebuild trust." Ultimately, McGuinness indicated that "she was not the right person for the job and wasn't willing to force" B.D.M.B. into sessions with her parents.

In October 2017, after a referral to Licensed Mental Health Therapist Amy Glasser, the family began participating in family counseling sessions. B.D.M.B. did not trust Kelli and Brandon and the primary goal of this counseling sessions was to "create a trusting relationship with the parents." The family's counseling with Glasser lasted until the end of September 2018, totaling a combined 37 individual and group sessions during that time. At the conclusion of family counseling, Glasser opined that the parents "telling the kids they weren't telling the truth" about the relapse "is what really stuck in terms of progress [the family] could make in therapy." Glasser also opined that family counseling would have been inappropriate prior to the parents taking "responsibility for all of their actions."

In April 2018, after the parents' visitation switched from supervised to monitored, B.D.M.B. began to refusing visits and contact with her parents. She last visited her parents in May 2018 but continued to see them in family counseling sessions.

In January 2019, the Department retained Psychiatric Nurse Practitioner JoAnne Solchany, Ph.D. to conduct a psychiatric evaluation of B.D.M.B. The pertinent parts of Dr. Solchany's written summary and recommendations state:

> [B.D.M.B.] is a very traumatized little girl. She meets criteria for PTSD. [B.D.M.B.] experienced a lot of trauma, she witnessed a lot of violence, she witnessed her parents engaging in behaviors that had the power to kill—including strangulation and stabbing, she reports her mother threatening to kill her and her siblings, and she experienced a significant level of neglect. Her fears were chronic and she was powerless to do anything to make it better for herself or her siblings. [B.D.M.B.'s] primary traumas were laid down during early childhood, the time in her life when she should have been able to trust her parents, feel safe, and feel well taken care of. This did not happen for her, she repeatedly experienced chaos, violence, drunkenness, and abuse.
>
>    . . . .
>
> . . . [Kelli and Brandon] both did a good job acknowledging and owning many of the issues. However, they never directly addressed the physical abuse and significant neglect that [B.D.M.B.] and her siblings have described occurring. Without this, it is highly unlikely that [B.D.M.B.] will be able to move forward with truly healing her relationship with her parents. Honesty is a very important step in healing and building trust. [B.D.M.B.] cannot repair and rebuild her relationship with her parents until she knows she can trust them. . . .
>
>    . . . .
>
> . . . Forcing her to reunite or even visit her parents will, more likely than not, lead to regression and the presentation of more significant and serious behavioral and emotional issues. It is also more likely than not that she will feel forced to disrupt the visits or any attempts at placement by engaging in big, concerning acting out. [B.D.M.B.]

7

would also lose the trust in those she currently has, whom she feels are there to protect her, because a return to her parents means those people failed her.

In addition to these recommendations, the Department asked Dr. Solchany to answer several questions, including this one:

> 5. What is the potential impact of reunification to [B.D.M.B.'s] mental health?
>
> [B.D.M.B.'s] primary plan should be to remain with her grandmother, a guardianship should be considered. However, both aunt and grandmother need to stop disparaging the parents, this is not healthy or helpful for [B.D.M.B.]—[B.D.M.B.] is still a product of both her parents and disparaging them can whittle away at her own sense of self and self esteem. That said, her grandmother's [house] is where she feels safe. This does not mean that [B.D.M.B.] cannot eventually have a positive relationship with her parents. If reunification is off the table for now, then this should help [B.D.M.B.] relax and feel safer, allowing her to actually begin considering having a relationship with her parents.

Dr. Solchany's report concludes that "it is not recommended to try and move B.D.M.B. towards a return home."

The five day termination trial began in May 2019. The court heard testimony from nine witnesses and considered 26 admitted exhibits.

Summer Justus, the assigned Department social worker from July 2015 and March 2017, testified to how the parents' lack of honesty regarding their relapse presented "a barrier" for them making progress. When asked about B.D.M.B.'s general feelings after the relapse, Justus responded, "She was mostly fearful of her mother. She was fearful that her father would not be protective with her mother."

Adams, the assigned social worker after March 2017, testified about referrals to the parents for court-ordered services. Adams said that there are no additional services the Department could offer that would help remedy the parents' deficiencies, and B.D.M.B. was "happy," "healthy," and "stable" in her placement with the grandmother. Adams also explained why she considered [B.D.M.B.'s] "near future" to be three to six months. Adams recalled Brandon voicing concern earlier in the dependency that his mother's animosity and distrust for him and Kelli could influence B.D.M.B. and undermine reunification. However, Adams said she had no reason to believe that the grandmother was undermining reunification efforts and recommended that the parents' rights to B.D.M.B. be terminated.

Erin Smith, a mental health therapist, testified to being B.D.M.B.'s therapist for two years beginning in 2015. According to Smith, B.D.M.B. talked a lot about "witnessing violence in the home, and also being the recipient of violence."

Willow Myers testified to being a family and child therapist who had been treating B.D.M.B. monthly since July 2018. Myers spoke about how B.D.M.B. "voiced to me that she's afraid to be alone with her parents." Myers noted how B.D.M.B. "doesn't want to reexperience her trauma," "would need to have some control" in initiating any reunification, and the process "would have to be done so very slowly."

Michelle Gordon, the assigned guardian ad litem, testified that B.D.M.B. has "trauma when it comes to the thought of having to return home," and the parents cannot meet her emotional needs because there "is no trust," no "parent/child bond." Gordon does not believe the parents can correct their parental deficiencies

9

in B.D.M.B.'s near future, which she described as between one and three months based on conversations with the child. According to Gordon, B.D.M.B. is "very bonded with her grandmother," needs permanency, and termination of parental rights is in B.D.M.B.'s best interests.

Glasser testified that she could not imagine B.D.M.B. getting to the point of wanting to live with her parents and opined, "reunification is virtually impossible if one of the parties cannot trust the other party." Glasser also rejected the notion the grandmother's alleged bad influence played a significant role in B.D.M.B.'s lack of trust in her parents because B.D.M.B.'s "got enough memories of her own to remember what she doesn't trust."

Dr. Solchany opined that Kelli and Brandon will not "be able to successfully or safely parent [B.D.M.B.] and have her live with them," B.D.M.B. does not have a healthy bond with the parents and "does not trust her parents to keep her safe and take good care of her." Dr. Solchany testified, "I wouldn't recommend reunification, so I wouldn't have any services to recommend in that direction," "I can't even imagine" how long it would take to move towards reunification, and "I don't know that it could ever happen." Her testimony did not mention, much less recommend, guardianship as an option.

Kelli acknowledged that B.D.M.B. "trusted and believed that" she and Brandon had changed but they "destroyed" that trust "when we had our relapse." She admitted to denying the relapse for an entire year and making her "children look like they were lying." Asked if she had any response to Dr. Solchany's report, Kelli testified, "I feel that she stated that it could be harmful emotionally to

10

[B.D.M.B.] if she was forced to go home. I feel that she listed a very, a variety of things as in she could have some, she could have depression, anxiety. She could not behave." Kelli further responded, "the possibility of those things may be having a higher probability of having since she's been exposed to trauma and whatnot, but that is all <u>may</u>. That is not certain. That is not, we cannot tell the future that that is what would happen." (Emphasis in original).

Brandon testified about exposing his children to "lots of arguing," "physical violence," and parental intoxication. He said that the children were removed for "good cause" and it took him a long time to "own up" to his actions. Brandon also testified that he and Kelli have a very strained relationship with his mother, B.D.M.B.'s paternal grandmother.

At the conclusion of trial, the court entered written findings of fact and conclusions of law terminating Kelli's and Brandon's parental rights to B.D.M.B. Both of the parents appeal and we consolidate the two appeals for review.

DISCUSSION

Parents enjoy fundamental liberty interests in "the continued care, custody, and management of their children." Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). But "when parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child." In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980).

In order to terminate the parent-child relationship, the Department must first prove the six termination factors set forth in RCW 13.34.180(1) by clear, cogent,

11

and convincing evidence.[3]  In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).  Next, due process requires the trial court to expressly or impliedly find by clear, cogent, and convincing evidence that the parent is currently unfit.[4]  Id. at 577.  If all of these elements are proven, the court must also find by a preponderance of the evidence that termination is in the best interests of the child.  Id.; RCW 13.34.190(b).

Where, as here, the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law.  In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990).  Unchallenged findings of fact are verities on appeal.  In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).  Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent[,] and convincing."  In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).  We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight of the evidence.  State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).  Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her."  A.W., 182 Wn.2d at 711.

---

[3] "Clear, cogent, and convincing" means highly probable.  In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

[4] "Satisfying all six of the statutory elements raises an implied finding of parental unfitness."  In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

I.   Mother's As-Applied Substantive Due Process Challenges

Kelli asserts that RCW 13.34.180 and .190 are unconstitutional and violate substantive due process, as applied to cases in which the Department's child expert has recommended a guardianship be considered, because the Department is not required to prove that a guardianship is not a viable alternative to termination. This assertion is not persuasive.

Washington courts presume statutes are constitutional. In re Dependency of C.B., 79 Wn. App. 686, 689, 904 P.2d 1171 (1995). The party challenging a statute's constitutionality has the burden of proving otherwise. Id. A party challenging the constitutionality of a statute as applied must show "that application of the statute in the specific context of the party's actions or intended actions is unconstitutional."[5] City of Redmond v. Moore, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004).

Kelli's as-applied challenge rests solely on her claim that "Dr. Solchany recommended that B.D.M.B. remain with her grandmother, but she also explicitly recommended 'a guardianship should be considered.'" But, the record does not support this claim. First, in Dr. Solchany's 13 page report, she includes three pages of summary and recommendations. None of those pages mention "guardianship" as an option to consider. Second, Dr. Solcharny did not testify about a guardianship when detailing her report recommendations at trial. Lastly, none of the parties ever raised or argued the issue of guardianship at trial.

---

[5] Determining a statute unconstitutional as applied forbids future application of the statute under similar circumstances, but such a determination does not totally invalidate the statute. Moore, 151 Wn.2d at 669.

It is well-settled that a "court must consider a dependency guardianship as an alternative to termination only when a petition for a dependency guardianship has been filed." In re Dependency of I.J.S., 128 Wn. App. 108, 121, 114 P.3d 1215 (2005); In re Dependency of T.C.C.B., 138 Wn. App. 791, 800, 158 P.3d 1251 (2007) (where there is no dependency guardianship pending, there is no constitutional or other requirement to consider a "theoretical dependency proceeding"). Here, the record contains no guardianship petition nor an explicit recommendation that one should have been considered.

Kelli cannot demonstrate that the terminations statutes are unconstitutional as applied to this case.

## II. Mother's As-Applied Procedural Due Process Challenge

Next, Kelli similarly argues that as applied here, Washington's termination statutes violate her rights to procedural due process. She contends that, when the Department's expert recommends consideration of a guardianship, due process requires the Department to prove a guardianship is not available before parental rights may be terminated.

Again, because there is no support in the record that a guardianship was ever filed, we reject Kelli's procedural due process claim. In re Dependency of K.S.C., 137 Wn.2d 918, 931, 976 P.2d 113 (1999) (Washington's termination statutes do not require a court to consider dependency guardianship as an alternative to termination where no petition has been filed).

14

III. Mother's Early Integration into Permanent Home Challenge

Kelli argues that the Department's evidence was insufficient to support the finding under RCW 13.34.180(1)(f), that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." She contends that there was no evidence establishing that if her and Brandon's legal relationship with B.D.M.B. remained intact that it would somehow disrupt B.D.M.B. finding permanency with her grandmother.

Notably, Kelli does not advance any legal argument to challenge the findings under RCW 13.34.180(1)(e), that there is little likelihood that conditions will be remedied so that the child can be returned to her in the near future. This finding is, therefore, a verity on appeal. A.W., 182 Wn.2d at 711. There is also ample support for this finding in the record. Guardian ad Litem Gordon testified that the parents could not correct their parental deficiencies in B.D.M.B.'s near future of one to three months. Family therapist Glasser indicated that the possibility of the parents reunifying with B.D.M.B. was "virtually impossible." Social worker Adams said that the parents "have not made progress in repairing their relationship with [B.D.M.B.]," and after more than four years of services towards that goal, B.D.M.B. "remains extremely fearful of returning home, and it would be against the recommendations of her mental health providers." Under this evidence, which we do not re-weigh on review, the trial court had no good reason to believe that the parents would correct their deficiencies at any time meaningful to B.D.M.B.

15

"Facts supporting a conclusion under RCW 13.34.180(1)(e) may, but do not necessarily, also support a conclusion under RCW 13.34.180(1)(f)." In re Dependency of K.D.S., 176 Wn.2d 644, 655, 294 P.3d 695 (2013). Here, the evidence supporting the trial court's finding under RCW 13.34.180(1)(e) also supports its RCW 13.34.180(1)(f) finding. Even if this were not the case, the court's finding under RCW 13.34.180(1)(f) is well supported by independent evidence in the record. Dr. Solchany warned, "Forcing her to reunite or even visit her parents will, more likely than not, lead to regression and the presentation of more significant and serious behavioral and emotional issues," and that B.D.M.B. "would also lose the trust in those she currently has, whom she feels are there to protect her, because a return to her parents means those people failed her."

The court had sufficient evidence to conclude that continuing Kelli's and Brandon's parental rights to B.D.M.B. diminished her prospects for early integration into a stable and permanent home.

IV. Mother's Best Interests of the Child Challenge

Lastly, Kelli argues that the court's findings do not support its conclusion that termination of her parent-child relationship was in the best interests of B.D.M.B. pursuant to RCW 13.34.190(b). She admits that the court's finding on this factor "establishes it is in B.D.M.B.'s best interest that the dependency end." But, Kelli claims that the finding "does not establish that termination of the legal relationship between B.D.M.B. and her parents was in her" best interest if B.D.M.B. were subject to a guardianship.

We accept Kelli's admission that the finding sufficiently establishes it is in B.D.M.B.'s best interest to terminate the dependency. And, because a termination petition was the only proceeding before the court, we reject the remainder of Kelli's argument. The court appropriately found that terminating Kelli's and Brandon's parental rights to B.D.M.B. was in the best interest of the child.

V. <u>Father's Provision of Necessary Services Challenge</u>

Brandon argues that the Department failed to satisfy RCW 13.34.180(1)(d), because it failed to offer reunification therapy.

In order to terminate parental rights, the Department must prove that it offered "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). "Necessary services" are those services "'needed to address a condition that precludes reunification of the parent and child.'" <u>In re Parental Rights to K.M.M.</u>, 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting <u>In re Dependency of A.M.M.</u>, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). Here, the court found, in pertinent part,

> 2.11 . . . Despite the offering of these services, there has been little improvement in parental functioning as to this child.
>
> A.  [The parents], social worker Summer Justus and social worker Zavtra Adams all testified as to the extensive and helpful services provided to this family.
>
> B.  The Court finds that the Department did provide and [the parents] did undergo a variety of services, and most of their parental deficiencies were corrected due to their participation in these services. As the result of these services, the youngest sibling was returned to their care. The only parental deficiency that remains is an inability to parent this particular

17

child due to broken trust and her lack of attachment to her parents at this time.

C.    The Court considered In re Parental Rights of B.P., 186 Wn.2d 292[, 376 P.3d 350] (2016) and [K.M.M.]. B.P. involved a much younger child than [B.D.M.B.], and that court could not find that services would have been futile had they been offered. K.M.M. involved an older child, who refuses to have contact with her father, and the Court finds that reunification therapy was not a necessary service[] because it would have been futile in that case. The Court finds this case very close to and with more similarities to K.M.M. In both this case and in K.M.M., while it is possible that attachment and bonding services might have prevented child detachment from a parent had they been previously provided, the parties cannot go back in time to prevent the damage from occurring. No service is now capable of correcting the parental deficiency within the foreseeable future.

D.    The Court does not find any fault with the Department's decision not to offer reunification therapy. In this case, the Department presented compelling evidence that reunification therapy would have been detrimental to the child before sufficient progress was made in the child's personal therapy. Family therapist Amy Glasser, child's therapists Willow Myers and Erin Smith, social worker Zavtra Adams, and Dr. JoAnne Solchany, professionals who were involved with the care and evaluation of [B.D.M.B.], all testified that reunification therapy was not a recommended service for this family at any point of this case because it would have been detrimental to [B.D.M.B.]. Until further progress could be made in [B.D.M.B.'s] personal therapy, reunification therapy could be damaging or traumatic to [B.D.M.B.] emotionally. Amy Glasser and Dr. JoAnne Solchany both testified that it could take years if [B.D.M.B.] was ever going to be ready for reunification therapy.

E.    Given that [B.D.M.B.] has not progressed far enough in her individual therapies or counseling to attempt reunification therapy with [the parents], nor has she been since it's been introduced in the case, reunification therapy would have been futile as it is not capable of correcting the parental deficiency in the foreseeable future. The Court finds by clear, cogent, and convincing evidence that the Department has provided all necessary services that are reasonable and capable of correcting the parental deficiencies within the foreseeable future.

18

(Emphasis added.)

The record supports the court's finding that the Department offered numerous services over the course of several years to address Brandon's parental deficiencies and to build his relationship with B.D.M.B. Despite significant progress in completing court ordered services, the record also indicates that Brandon's actions contributed to the broken bond and lack of trust with B.D.M.B.

Likewise, there is no record of any of the numerous professionals and mental health providers ever recommending reunification therapy as a necessary service. In fact, reunification therapy services were not recommended at any point during this dependency proceeding. Where there is no evidence that the parent-child bond could be repaired within a time frame that would be conducive to the child's "emotional development and well-being[,]" the Department had met its obligation under RCW 13.34.180(1)(d). K.M.M., 186 Wn.2d at 487.

Substantial evidence supports the court's findings regarding this termination factor.

### VI. Father's Unfit Parent Challenge

Brandon also contends the Department did not prove he is currently unfit and unable to care for B.D.M.B. To establish current unfitness in a termination proceeding, the Department must prove by clear, cogent, and convincing evidence that the parental deficiencies "prevent the parent from providing the child with 'basic nurture, health, or safety.'" In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014) (quoting RCW 13.34.020). He argues that none of his

deficiencies make him unfit to parent B.D.M.B., but rather, it is B.D.M.B.'s "current status in treatment that made her unable to bond with her father."

The K.M.M. court explained that the absence of attachment to a parent is a condition that interferes with a parent's ability to provide for a child's health, safety, and well-being and may ultimately render a parent unfit. 186 Wn.2d at 493-94. Here, several witnesses testified about the absence of any trust or a bond between the parents and B.D.M.B. Gordon testified that B.D.M.B.'s parents cannot meet her emotional needs because there is no trust and no parent-child bond. Dr. Solchany explained that B.D.M.B. does not have a healthy bond with her parents and "does not trust her parents to keep her safe and take good care of her." Kelli spoke about how she and Brandon "destroyed" B.D.M.B.'s trust in them. Substantial evidence supports the court's finding that Brandon was currently unfit to parent B.D.M.B.

CONCLUSION

In sum, we reject the constitutional challenges to the termination statutes and conclude that substantial evidence supports the trial court's termination findings.

Affirmed.

_Appelwick, J._

WE CONCUR:

_Andrus, A.C.J._     _Dwyer, J._

20